UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MICHAEL SCHILLER, FRANCESCA | : | |
| FIORENTINI, ROBERT CURLEY, and | : | |
| NEAL CURLEY, | : | |
| | : | |
| Plaintiffs, | : | **COMPLAINT** |
| -versus- | : | |
| | : | 04 Civ. |
| The CITY OF NEW YORK; RAYMOND | : | |
| KELLY, Commissioner of the New York City | : | |
| Police Department; TERENCE MONAHAN, | : | |
| Assistant Chief of the Bronx Bureau of the New | : | |
| York City Police Department, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PRELIMINARY STATEMENT

1.      This is an action to vindicate the civil rights of individuals who wish to participate in or

simply to observe lawful and peaceful demonstrations in New York City.  During the Republican

National Convention, the New York City Police Department deployed a policy and practice of

indiscriminately arresting large groups of people who were peacefully assembled on City

sidewalks and who either were participating in or were in the vicinity of demonstrations.  Those

arrested then were detained, without justification, by the NYPD for prolonged periods in

unhealthy and perhaps dangerous conditions, thereby preventing them from participating in further

protest activity or from simply going on with their lives.  Finally, the Department systematically

fingerprinted those arrested for minor offenses during the Convention, resulting in delays in their

release and in the improper entry of fingerprints into government databases.  Through this lawsuit

the plaintiffs seek to have these NYPD actions declared unlawful so they are not used at future

demonstrations in New York City.

2.      The Republican National Convention prompted hundreds of thousands of people to participate in lawful demonstrations in New York City between August 26, 2004, and September 2, 2004.  Despite the overwhelmingly peaceful nature of the demonstrations, the NYPD arrested more than 1,800 people, most of them for minor offenses such as disorderly conduct and parading without a permit.  Because the NYPD deployed mass-arrest tactics—such as mesh nets to trap groups of people on sidewalks—the Department ended up arresting many people who were engaged in lawful protest activity or who were not even demonstrators.  The Department then held hundreds of people for more than twenty-four hours, with many of them spending long periods of time in a filthy bus depot converted into an arrest holding facility for the Convention.  Finally, the NYPD systematically fingerprinted those arrested for minor offenses during the Convention.

3.      On the second day of the Convention—Tuesday, August 31, 2004—a group known as the War Resisters League organized a march from near the World Trade Center site to the vicinity of Madison Square Garden.  Though some participants reportedly had planned to engage in non-violent civil disobedience in which demonstrators would lay down in the street to dramatize war deaths, many of those assembled--including the plaintiffs in this action--had no intention of engaging in unlawful action.  As people gathered near Church and Fulton Streets, the police negotiated with demonstration organizers and agreed that the group could march as long as they remained on the sidewalk, obeyed traffic laws, and walked two-by-two.  As captured on a videotape, supervisory NYPD officers made announcements that the event could proceed in this manner, though the announcements were not heard by all demonstrators.  At 4:00 p.m. the march began, with the first people crossing Church Street and proceeding east across Fulton Street. Participants attempted to comply with the NYPD instructions, and the sidewalk was not blocked.

Nevertheless, the police almost immediately stopped the march and, without giving people a meaningful opportunity to disperse, surrounded and arrested 227 people standing on the sidewalk, including people not even participating in the demonstration.

4.      After being handcuffed, photographed, and waiting for up to two hours, those arrested on Fulton Street were transported to a bus depot known as Pier 57, which the NYPD had converted into an arrest holding facility for the Convention.  After being searched and having their property confiscated, people were held in overcrowded and filthy conditions for long periods of time without the NYPD making adequate efforts to facilitate their processing and release.

5.      After long delays, those arrested on Fulton Street and held at Pier 57 were taken to the New York City criminal courts for processing.  Though virtually all of those arrested were charged with only minor offenses, the NYPD systematically fingerprinted them and, upon information and belief, forwarded those fingerprints to state and federal law-enforcement agencies.   Eventually— and in many instances only as a result of court orders—people were released, with some having spent more than a day and a half in police custody.

6.      Plaintiffs Michael Schiller, Francesca Fiorentini, and Robert and Neal Curley were all arrested on a Fulton Street sidewalk while participating in or observing the War Resisters League demonstration.  Although they came to Fulton Street that day for different reasons—Mr. Schiller as a documentary filmmaker, the Curleys as father-and-son visitors from out of town, and Ms. Fiorentini as a frequent protester—their experiences were nearly identical and are representative of

the treatment received by the group of over 200 individuals who were arrested that day near the World Trade Center, detained at Pier 57, and processed at 100 Centre Street.

7.      Plaintiff Michael Schiller was working on a documentary financed by Home Box Office Films following the political decision-making process of Andre 3000, a member of the Grammy-award-winning musical group Outkast, as he attended the Democratic and Republican National Conventions in preparing to vote for the first time in a presidential election.  Mr. Schiller was lawfully on a public sidewalk near the front of the march attempting to film the protesters moving toward him when he was surrounded by police netting and placed under arrest.  Despite his pleas to the officers that he was a member of the press working on a documentary, he was not released. Rather, he was falsely arrested, held for over thirteen hours at Pier 57, unlawfully fingerprinted, and eventually released after spending twenty-eight hours in police custody, having been charged with nothing more than minor offenses.

8.      Plaintiff Francesca Fiorentini is a 21-year-old undergraduate student at New York University who attended and photographed the War Resisters League demonstration in lower Manhattan.  After proceeding on the sidewalk as directed by the NYPD commanding officer, Ms. Fiorentini was surrounded, arrested, placed in overly tight handcuffs, and made to sit on the street for two hours without food or access to bathroom facilities, awaiting transportation to Pier 57. She then was held for seventeen hours at Pier 57, where detainees were kept in overcrowded cells with inadequate sitting or sleeping space and where most had to sit or lie on a floor covered with black oily soot.  After then being transported to the criminal courts, Ms. Fiorentini was unlawfully fingerprinted and suffered through more delays, spending another fifteen hours in holding cells.

Finally, at 3:00 a.m. on Thursday morning, after having spent thirty-five hours in police custody and being charged only with disorderly conduct, she was released.

9.      Plaintiff Robert Curley, a 50-year-old lawyer from Philadelphia, was visiting New York with his 17-year old son, plaintiff Neal Curley.  They planned to participate in the War Resisters League march until it reached Union Square, where they had tickets to see a play that evening. Like Mr. Schiller and Ms. Fiorentini, they were lawfully standing on the Fulton Street sidewalk when the police arrested everyone on that side of the block.  Mr. Curley and his son Neal were confined at Pier 57, unlawfully fingerprinted, and held for sixteen hours before being released.

10.      On October 6, 2004, the Manhattan District Attorney's office announced that it would dismiss all of the 227 prosecutions arising out of the August 31 arrests on Fulton Street.

11.      The City of New York's policies and practices of making mass arrests of persons lawfully participating in or observing demonstrations, policies and practices of detaining those arrested on minor offenses for prolonged periods of time in unhealthy conditions, and policies and practices of routinely fingerprinting persons arrested for minor offenses at demonstrations violated the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law.  Mr. Schiller, Ms. Fiorentini, Robert Curley, and Neal Curley seek declarations that these policies were unlawful; seek declarations that their arrests, detentions, and fingerprinting were unlawful; and seek injunctions requiring the return or destruction of their fingerprints and other records associated with their arrests.  Plaintiffs also seek compensatory damages and attorneys fees.

## JURISDICTION AND VENUE

12.     This court has subject matter jurisdiction over the plaintiffs' claims pursuant to

28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4).

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) in that plaintiffs' claims arise in the

Southern District of New York.

14.     Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201, 2202.

Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.  An award of

costs and attorneys fees is authorized pursuant to 42 U.S.C. § 1988.

15.     This court has supplemental jurisdiction over all state constitutional and state law claims

pursuant to 28 U.S.C. § 1367(a).

## PARTIES

16.     Plaintiff MICHAEL SCHILLER is a resident of Brooklyn, New York.

17.     Plaintiff FRANCESCA FIORENTINI is a resident of Manhattan in New York City.

18.     Plaintiffs ROBERT CURLEY and NEAL CURLEY are residents of Philadelphia,

Pennsylvania.

19.     Defendant the CITY OF NEW YORK is a municipal corporation within the State of New York.

20.     Defendant RAYMOND W. KELLY is the Commissioner of the New York City Police Department.  He is sued in his official capacity for declaratory and injunctive relief.

21.     Defendant TERENCE MONAHAN is an Assistant Chief assigned to the Bronx Borough Command of the New York City Police Department.  Assistant Chief Monahan ordered the unlawful mass arrest of demonstrators and observers, including Mr. Schiller, Ms. Fiorentini, and Robert and Neal Curley, on Fulton Street near Church Street on August 31, 2004.  He is sued in his official and individual capacity for compensatory damages.

<u>FACTS</u>

22.     The Republican National Convention was held in New York City from August 30, 2004, to September 2, 2004.  On September 2, President Bush accepted his party's nomination for a second term.  Hundreds of thousands of people participated in peaceful demonstrations in New York City in the week leading up to Mr. Bush's acceptance.

23.     The City of New York began planning for the Convention more than a year in advance, and published reports indicated the NYPD was preparing to handle as many as 1,000 arrests a day. Despite repeated statements by NYPD officials, including Police Commissioner Raymond Kelly, about the threat posed to New York City by "hard-core" and "dangerous" protesters, the demonstrations proved to be overwhelmingly peaceful.  New York City Mayor Michael

Bloomberg professed to welcome convention participants and peaceful protestors alike, pledging that the city's security plan would "protect[] the rights of convention-goers and protesters without unnecessarily getting in the way of New Yorkers as we go about our daily lives."

24.    At Convention-related demonstrations there were nearly 1,800 arrests, many of them mass arrests of people lawfully on public sidewalks or streets, with law-abiding demonstrators and innocent bystanders alike being swept up.  On Friday, August 27, police officers used orange nets to trap and arrest scores of people participating in a bicycle protest that the NYPD had allowed to take place for nearly one and one-half hours before making mass arrests without warning.  Two days later—on Sunday, August 29—the NYPD used nets again to arrest groups of people lawfully standing on sidewalks in Times Square, including legal observers and members of the press.  The use of this type of indiscriminate arrest tactic is wholly unreasonable, as it is virtually certain to result in the arrest of people engaged in lawful activity.

25.    On Tuesday, August 31, 2004, the War Resisters League organized a demonstration against the policies of the Bush administration.  The demonstration was supposed to begin at the World Trade Center site and proceed to near Madison Square Garden.  Although it had been announced that some participants would engage in non-violent civil disobedience by lying in the street to dramatize war deaths, many of those participating in the demonstration had no intention of engaging in unlawful activity.

26.     At about 3:00 p.m. people began gathering near the World Trade Center site on the corner

of Church and Cortlandt Streets, while others took advantage of the shade further north on Church

at Fulton Street.  Ed Hedeman, an organizer with the War Resisters League, negotiated with the

police department to allow the march.  Mr. Hedeman told the New York Times that "the

commanders assured him the march could proceed—east on Fulton Street and up Broadway to the

Garden—as long as participants walked two abreast, in order to keep sidewalks clear, and did not

block traffic at intersections."  A videotape of the event shows that police officials informed

people that the march could proceed along the public sidewalk.

27.     At approximately 4:00 p.m. the march began.  There were 800 to 1000 people assembled at

this time.  Those at the front of the march crossed Church Street and proceeded eastward down

Fulton Street.  The march was silent and solemn.  As is shown on a videotape of the incident,

almost immediately after the march began and before it had gone even a full block, police halted

the march, surrounded over 200 people with officers and then nets, and arrested them all, even

though they had remained on the public sidewalk, were not blocking the sidewalk, and had made a

good-faith effort to comply with police instructions.  Those arrested were given no meaningful

opportunity to disperse.  Defendant Assistant Chief Terence Monahan ordered this mass arrest.

28.     The over 200 people arrested on the Fulton Street sidewalk were transported to a facility

known as Pier 57.  Pier 57 is a block-long, three-story pier on the Hudson River at 11th Avenue

and 15th Street in Manhattan that was formerly a Metropolitan Transit Authority bus depot.

Police constructed multiple holding cells inside the facility using chain-link fence topped with

razor wire.  Each cell had two sections, one in which the arrestees were kept, and another, buffer

zone, which contained a portable toilet.  Upon arrival at Pier 57, detainees were searched, had their

property confiscated, and were placed in one of the holding cells.  Most arrestees spent time in

more than one cell during their stay in Pier 57, and the amount of time that detainees arrested at

the same time spent in Pier 57 varied.  According to published reports, three environmental

inspections of the facility in 2001 and early 2004 uncovered safety hazards including easily

disturbed asbestos particles, lack of adequate fire protection systems, and floors covered with

black oily soot.  Detainees could not sit on the floor without becoming covered in the filth.  There

were generally not enough benches for the number of arrestees in each cell.  Many arrestees got

rashes or blisters from the substance on the floor.  The air quality was also poor, and many

arrestees developed coughs or had difficulty breathing.  At night, the facility became cold, and the

detainees, who were dressed for a hot summer day in New York, were not provided with any

blankets, nor was there any heat.  The arrestees were provided with food at sporadic times while at

Pier 57, although some went many hours before receiving anything to eat.

29.     Upon information and belief, there was no fingerprinting equipment at Pier 57, and the

only processing that took place there was the inventorying of personal belongings.  Upon

information and belief, the criminal courts were available to process those being held at Pier 57,

and the State of New York was processing fingerprints in a timely manner.  Nonetheless, the

NYPD, without any known justification, detained people at Pier 57 for lengthy periods of time

without making any meaningful effort to process them so they could be released.  As a result of

this, many people, including the plaintiffs, remained in police custody for unnecessarily lengthy

periods of time.

30.     Upon information and belief, all cameras seized from people at Pier 57 were inventoried as arrest evidence, meaning that, unlike other personal property that would be returned upon release from custody, the cameras would not be returned until the individual's criminal case was resolved.

31.     From Pier 57 the detainees were transferred to Central Booking at 100 Centre Street for processing, in many cases after countless hours had passed. There individuals were routinely photographed and fingerprinted.  The detainees were held for additional time at Central Booking before being either arraigned in front of a judge or given a Desk Appearance Ticket.  Upon information and belief, those arrested on Fulton Street were charged with only violations such as disorderly conduct or parading without a permit.

32.     Many detainees were denied access to attorneys during the time they were held.  The situation persisted despite the fact that State Supreme Court Justice Emily Jane Goodman came to the courthouse at midnight on September 1 and signed an order requiring the City to allow defense lawyers to meet with their clients. According to press reports, officers failed to comply with the court's order.

33.     Because of the extended periods of time those arrested on August 31 had been, on September 2, Acting State Supreme Court Justice John Cataldo in Manhattan ordered the city to either bring demonstrators before the court or to release them. After the City failed to comply, the judge held the City in contempt for failing to release or have ready for arraignment approximately 560 people. Justice Cataldo acknowledged that the City was faced with processing a large number of arrestees, but urged the NYPD to release individuals who had been charged with only violations

yet had been held for more than thirty-six hours. The City also faced allegations that the NYPD was intentionally not releasing protesters to keep them from demonstrating on September 2, when President Bush was scheduled to be in New York City.  As of the filing of this complaint, the City has failed to provide a credible explanation as to why it detained for so long people charged with only minor offenses.

34.     On October 6, 2004, the Manhattan District Attorney's office announced that it would dismiss all of the 227 prosecutions arising out of the August 31 arrests on Fulton Street.

35.     The mass arrest of people at demonstrations substantially chills the exercise of First Amendment rights.  When the police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to be comfortable engaging in future protest activity.  Moreover, when such arrests take place at highly publicized events such as the Republican National Convention, the public at large is given the message that participation in protest activity is likely to lead to arrest.

<u>PLAINTIFF MICHAEL SCHILLER</u>

36.     Michael Schiller is a 31-year-old resident of Brooklyn.  He owns a film and video production company called Freed Pictures.

37.     During the Republican National Convention, Mr. Schiller was working on filming a documentary that follows the political decision-making process of Andre 3000, a member of the Grammy-award-winning musical group Outkast as he attends the Democratic and Republic

National Conventions and for the first time chooses a candidate to support. Mr. Schiller's company was hired by Blowback Productions, which received funding for the documentary from HBO Films.

38.     At about 3:30 p.m. on August 31, 2004, Mr. Schiller arrived at the World Trade Center site with his team, which included his business partner, John Fine, a production assistant, Dan Levin, and an intern for Blowback, Shana Rigby. He spent half an hour interviewing people at the World Trade Center site for the documentary.

39.     Mr. Schiller then crossed Church Street in order to film the demonstration, after which he intended to leave and go to Union Square and then on to other work.

40.     The march began and crossed Church Street. Mr. Schiller moved east along the Fulton Street sidewalk, filming the march for most of the time.

41.     Mr. Schiller did not hear any announcements or instructions from the police.

42.     As Mr. Schiller backed up while filming, he was stopped by a police officer. The march was not allowed to proceed further. The police blocked the crowd with their bicycles on Fulton Street, and there were also officers on the sidewalk. The police surrounded the group with orange netting. Mr. Schiller asked an officer if they were being arrested and was told no.

43.     Shortly thereafter, Mr. Schiller heard a police officer yelling that they were all under arrest.

44.     Mr. Schiller did not have a press pass, but explained to several police officers on the scene that he was filming a documentary.  He observed other members of the press asking officers to be released and showing press passes.  One person was released, while others, also with press passes, were instead placed under arrest.

45.     One-by-one, the demonstrators and Mr. Schiller were removed from the netting and placed under arrest.  Mr. Schiller was handcuffed with flexcuffs and made to sit on the ground.  He then was photographed with his arresting officer, who upon information and belief was an Officer Toth.

46.     Ms. Rigby, the intern working with Mr. Schiller, was also inside the orange netting and was also arrested.  The other members of Mr. Schiller's team were across the street and were not arrested.

47.     At about 5:30 p.m., Mr. Schiller was placed on a bus and transported to Pier 57.

48.     On the bus some people were complaining that their flexcuffs were too tight.  One man, approximately sixty-five years old, stood up and started shouting that his handcuffs were too tight and that he needed his chronic pain medication.  One of the officers on the bus, who upon information and belief was an Officer Stoltzer, pushed the man back into his seat and threatened him.  Mr. Schiller was in flexcuffs for approximately two hours.

49.     At about 6:00 p.m., when he arrived at Pier 57, Mr. Schiller stood in line with others from the demonstration.  After waiting in line, at about 6:30 p.m., he went through a metal detector, was

14

searched, and his flexcuffs were removed.  He received vouchers for his property.  His camera equipment was treated as arrest evidence, and placed in a separate bag from his other personal property.

50.     At this time, Mr. Schiller was asked for identification.  He presented his New York State drivers license which was valid, in good condition, and bore his current address and an accurate picture.  This was the only processing that occurred while he was at Pier 57.

51.     Mr. Schiller was placed in a holding cell with about fifty other people.  There was seating for only twenty people, and there was not enough space to lie down.  The floor was filthy and covered with black oily soot.  There were portable toilets for people to use, but there was nowhere for anyone to wash their hands.  The people in the cell were given bologna sandwiches, but Mr. Schiller felt his hands were too dirty to eat with.

52.     After six or seven hours, Mr. Schiller was taken out of his cell, searched, and placed in another holding cell.  After another six or seven hours, he and all the other men at Pier 57 were moved to a large holding cell at one end of the facility.  They were required to sit in rows on the ground.

53.     At approximately 7:30 a.m., Mr. Schiller was put in flexcuffs again and escorted to a caged bus to be taken to Central Booking.  Although he complained on numerous occasions that the flexcuffs were too tight and that he was losing feeling in his hands, his requests to have them

changed or removed were ignored.  After going through a metal detector at Central Booking, Mr.

Schiller's flexcuffs were finally removed.

54.     When Mr. Schiller arrived at Central Booking, he was put into a medium-sized holding

cell with approximately thirty other men.  He realized after one hour that he could make a phone

call and proceeded to call his business partner and girlfriend.  He spent three to four hours in this

cell.

55.     At about 12:00 p.m. on September 1, officers removed the demonstrators from the cell and

chained them together in groups of five.  Mr. Schiller still did not know why he was arrested or

how much longer he would be held.

56.     At this time, Mr. Schiller was fingerprinted, despite the fact that he had been arrested for

only violations and despite the fact that he had in his possession valid New York State

identification, which he had shown to the police.

57.     The group was again chained together and put into another medium-sized cell with five

other groups of five.  The handcuffs were not removed, making it difficult for any member of the

group to move without tightening the handcuffs of his fellow detainees.

58.     Mr. Schiller was taken to another cell of about the same size, but with fewer people.  Soon

he was chained to another group and taken for more photographs.  His final cell contained a pay

phone, with which he was able to make some more phone calls.  At this point, Mr. Schiller had

been in custody over twenty-four hours and started to demand answers from the nearby officers, but to no avail.

59.     At about 7:00 p.m. or 7:30 p.m., Mr. Schiller met a Legal Aid attorney and spoke with him for fifteen minutes.  He was arraigned in front of a judge and accepted an adjournment in contemplation of dismissal because he was concerned that, if he did not, his camera and audio equipment, which he needs for his business, would continue to be held as evidence.  He was released at 8:00 p.m. on September 1, 2004 after being held for approximately twenty-eight hours. Mr. Schiller later learned that Ms. Rigby had been held for forty-eight hours.

60.     Mr. Schiller returned to retrieve his things on September 3 with a list of the equipment that had been confiscated.  The officer on duty in the property room, who upon information and belief was an Officer McKnenan, became irritated with Mr. Schiller when he expressed his desire to make sure all of his belongings were returned before signing a form verifying that he had received everything.  The officer threatened to retain Mr. Schiller's expensive equipment, and Mr. Schiller relented and signed for his property.

61.     Mr. Schiller was traumatized by his experience.  He now feels paranoid and anxious when he sees police officers on the street.  His doctor advised him that his symptoms are typical of post traumatic stress disorder.

<u>PLAINTIFF FRANCESCA FIORENTINI</u>

62.     Plaintiff Francesca Fiorentini is a 21-year-old resident of Manhattan.  She is currently a senior at the New York University's Gallatin School of Individualized Study.

63.     Ms. Fiorentini is politically active.  She is a member of the NYU Peace Coalition and has attended many demonstrations in New York City against the Iraq war, including one at the United Nations.  Other members of the NYU Peace Coalition have demonstrated on other occasions at Senator Hillary Clinton's office and at MTV's Total Request Live.

64.     On August 31, 2004, Ms. Fiorentini arrived at the World Trade Center site around 3:30 p.m.  She came to the demonstration by herself.  Her primary interest in attending the demonstration was to take pictures.  She had no intention of being arrested that day.

65.     Ms. Fiorentini was near the front of the march.  She vaguely heard the police announce something over a bullhorn, and she was aware of the direction that people march two-by-two.  Ms. Fiorentini and others at the demonstration did their best to comply with these requirements, but it was not easy for a loosely organized crowd to respond quickly to police directions.

66.     Throughout the brief march, Ms. Fiorentini and the other demonstrators remained on the sidewalk and obeyed all known police orders.  She never blocked the sidewalk, never refused to disperse, and never intended to engage in unlawful activity.

67.     Police on foot surrounded the first 200 people in the march, including Ms. Fiorentini, on Fulton Street.  The police then surrounded the demonstrators with orange netting.  A second line of police on bicycles surrounded the group, and these bicycle police encircled them with a second roll of orange netting.  An announcement was made that the demonstrators were under arrest, including Ms. Fiorentini.

68.     After approximately thirty minutes, NYPD transport vehicles arrived.  It took an additional hour to two hours to complete all the arrests.

69.     Each arrestee was handcuffed with flexcuffs, including Ms. Fiorentini.  She and the other demonstrators were moved down Fulton Street and made to sit on the ground in groups of five. While there, she began crying because she was so upset about being arrested.

70.     After about one hour, Ms. Fiorentini was photographed with her arresting officer, who upon information and belief was an Officer Boyle, and her property was placed in a plastic bag in her lap.

71.     Ms. Fiorentini's flexcuffs were tight and uncomfortable.  The loose ends of the plastic cuffs made it difficult for her to sit down.  She kept her fingers moving in order to avoid losing feeling in her hands.  Other demonstrators lost feeling in their hands, had the flexcuffs cut into their wrists, and were in extreme pain.  Ms. Fiorentini's flexcuffs were finally removed after nearly four hours.

72.     Several police officers told Ms. Fiorentini while she was being arrested that she had not done anything wrong and that she would be released soon.

73.     Ms. Fiorentini, along with other demonstrators, was placed on a bus and transported to Pier 57.  The drive to Pier 57 took approximately fifteen minutes.

74.     At approximately 7:00 p.m., Ms. Fiorentini and the others on her bus arrived at Pier 57. When they arrived, the manager of the facility came onto the bus and told the group, "We are going to try to get you out of here by tonight."

75.     Upon exiting the bus, Ms. Fiorentini joined a long line of arrestees to hand over their property and to provide identifying information to the police officers.  She provided her California drivers license, which was valid, in good condition, and bore her permanent address and an accurate picture.

76.     At the end of this process, Ms. Fiorentini was put into a cell where she was held from 7:30 p.m. to 9:00 p.m.  During this time, the group in the cell was given sandwiches made from grey and discolored bologna.

77.     One-by-one, the individuals in the first cell were called by name to identify themselves and walk over to one of the large holding cells in the front of the facility.  Ms. Fiorentini was held in this second cell from approximately 9:00 p.m. until 2:00 a.m.  The cell was extremely crowded and contained about 100 women; there was not room for everyone to sit or lie down.  Along the

edge of the cell were only two benches that sat around twenty people.  Otherwise, the women were forced to stand or to sit or lie on the floor.  During this period, Ms. Fiorentini and the other arrestees had to ask a police officer to allow them to use the portable toilet just outside their cell.

78.     The floors at Pier 57 were covered with black oily soot.  Ms. Fiorentini could not touch the floor without becoming covered in this substance.  She made a seat for herself on the ground out of sandwich bags.  She sat on the sandwich bags and rested her head on paper towels she had requested for this purpose and was able to sleep in this position for a couple of hours.  Some people got rashes from the substances on the floor.

79.     The air quality in the facility was poor.  For two days after leaving Pier 57, Ms. Fiorentini was coughing and felt as though she had something in her throat.  Ms. Fiorentini also spoke to officers who were sitting outside of the cell who complained to her that as a result of their working there, they were forced to increase their allergy medication because of the air quality.

80.     Pier 57 is on the Hudson River, and in the evening, it became very cold in the cells.  The windows were kept open, presumably in an attempt to get rid of the motor oil smell.  Ms. Fiorentini was wearing a tank top and cutoff pants, and many other people in the cell were wearing tank tops and skirts.  She put her hands inside her shirt to keep warm.

81.     At some time after 2:00 a.m., those in Ms. Fiorentini's cell were permitted to expand into the adjacent buffer cell that contained the bathroom facilities to create more space.  She remained in this larger cell for ten more hours.

82.     Ms. Fiorentini was never asked any questions or formally read her rights, nor was she told the charges against her.  She was not allowed to make any phone calls at Pier 57.  Upon information and belief, no processing other than the inventorying of property took place at Pier 57.

83.     Ms. Fiorentini did not leave Pier 57 until 12:00 p.m. on September 1, 2004.  At this time, Ms. Fiorentini was handcuffed with flexcuffs, put on a bus, and taken to Central Booking at 100 Centre Street.

84.     At about 12:45 p.m., after arriving at Central Booking, Ms. Fiorentini went through the metal detectors, and her flexcuffs were removed.

85.     Ms. Fiorentini was shuffled through a collection of different kinds of cells.  One was even more crowded than the first holding cell at Pier 57 and contained more than 100 people.  This cell was claustrophobic, and those in it were edgy and having difficulty coping with the close quarters. From 12:45 p.m. until 4:30 p.m. or 5:00 p.m., officers were taking people out of the cells and chaining them together to move to other cells.  Ms. Fiorentini was taken to a smaller cell where she was held for another hour.  She was in this cell with seven other people, but later heard that officers had crammed twenty people into a cell of the same size.  She complained to the officers at this point that she had been there for more than twenty-four hours.

86.     At approximately 5:00 p.m., Ms. Fiorentini was electronically fingerprinted.  Then she was chained to other detainees and taken to a cell upstairs where she saw the sun go down.  She was dismayed at the thought of spending another night locked up.  During this time, the detainees were

taken one-by-one from the cell to make a phone call.  They were given more sandwiches and overripe nectarines.  Ms. Fiorentini stayed in this cell until midnight.  She was then taken to be photographed and medical attendants asked about her physical condition.

87.     While at Centre Street, various officers told her, "You shouldn't be out protesting."  One officer said, "They don't want you out on the street when Bush is here."

88.     Finally, Ms. Fiorentini was taken to the last cell of her stay at Central Booking.  The other individuals in this cell had not been part of any protest.

89.     At 3:00 a.m. on September 2, 2004, Ms. Fiorentini was released and given a Desk Appearance Ticket charging her with disorderly conduct, which under New York law is classified as a violation.  Ms. Fiorentini never saw a judge and was never told verbally why she had been arrested.  She had spent thirty-five hours in the custody of the NYPD.

90.     Ms. Fiorentini was angry and frustrated at the length of her detention, the lack of information provided to her, and the fact that she had been arrested while peacefully standing on the sidewalk.

## PLAINTIFFS ROBERT AND NEAL CURLEY

91.     Plaintiff Robert Curley is a fifty-year-old union lawyer who resides in Philadelphia, Pennsylvania.

92.     Plaintiff Neal Curley, the son of Robert Curley, is seventeen years old and a high school senior.

93.     Since Neal was eight years old, he and his father have taken an annul trip to New York City.  Often, they go to attend a play the week before Neal starts school.  In August 2004 they took this trip with an additional purpose: to register, during the Republican National Convention, their opposition to the war in Iraq and how it is being conducted.

94.     On August 31, 2004, Mr. Curley and Neal drove to Hoboken, New Jersey from Philadelphia and took the Port Authority Trans-Hudson (PATH) train to New York City.  They arrived at the World Trade Center PATH station on Church Street in lower Manhattan.

95.     Upon arrival, they went to the Theatre Development Fund's TKTS discount theater ticket booth at South Street Seaport to check the availability of tickets for the play De La Guarda.  They were able to purchase tickets for that night's show, being performed at the Daryl Roth Theatre in Union Square.

96.     Mr. Curley and Neal had read in the New York Times about the planned march on the afternoon of August 31, 2004 organized by the War Resisters League, beginning at the World Trade Center site.  They were not aware of any planned civil disobedience.

97.     The Curleys decided to join the War Resisters League march to voice their opposition to the Iraq war.  The march route also coincided with their plans for the evening: they intended to

march with the War Resisters League to Union Square, have dinner, and then attend De La Guarda.

98.     At about 3:00 p.m. on August 31, 2004, the Curleys arrived back at the World Trade Center site in lower Manhattan.

99.     Before the march started, the police announced to the assembled group that they could march as long as they observed traffic rules, stayed on the sidewalk, and walked two-by-two.

100.    At about 4:00 p.m., the first group of marchers crossed Church Street and headed east on Fulton Street.  The Curleys were in the next group of marchers.  This group waited for the traffic light to change to green and the pedestrian signal to change to white before they crossed Church Street.

101.    As they crossed Church Street, Mr. Curley and Neal walked next to each other.  No one else was walking abreast of them.

102.    The Curleys then proceeded about twenty feet east on Fulton Street, on the sidewalk on the north side of the street.  At that point, they stopped because the police were blocking the front end of the march.

103.    The Curleys then found themselves surrounded by police officers on bicycles.  Mr. Curley told Neal that he thought they were being arrested.  They attempted to walk west, back toward

Church Street.  After proceeding about ten feet, they had to stop because police scooters were blocking the sidewalk at Church Street.

104.     When the police surrounded the sidewalk, people chanted, "Let us disperse!," but the police did not respond.

105.     At this point, the police surrounded the marchers with orange mesh netting.  Mr. Curley asked what they were being arrested for, but nobody answered.

106.     The police took the Curleys' cell phones and wallets and Neal's cameras and placed them in plastic bags.  Polaroid photographs were taken of the two with a female African-American police officer.  Robert Curley and his son Neal were then placed in plastic handcuffs.

107.     After the first police arrestee transport vehicle arrived, the Curleys were pushed toward the media, who were toward the south side of Fulton Street. The Curleys were then loaded onto a police bus and taken to Pier 57.

108.     Sometime between 5:00 p.m. and 5:30 p.m. on August 31, 2004, the Curleys arrived at Pier 57.  They were taken off the bus, their handcuffs removed, and again photographed, this time with a white male police officer who, upon information and belief, was an officer Rickli.  The police took the plastic bags with their belongings.  The Curleys were then placed in a holding cell with, in the end, about thirty to forty other people.

109.    The Curleys were asked for identification.  They presented their Pennsylvania drivers licenses, which were valid, in good condition, and bore their current addresses and accurate pictures.

110.    After about an hour, they were taken out of their cell and received property vouchers for their belongings.  Their cell phones and wallets were vouchered as personal property, and Neal's cameras were vouchered as arrest evidence.  After this, no further processing occurred while the Curleys were at Pier 57.

111.    At about 1:00 a.m. on September 1, 2004, the Curleys were placed back in plastic handcuffs and taken to a Department of Corrections bus and driven to 100 Centre Street.  There, they were photographed and fingerprinted.

112.    Mr. Curley had his prints taken twice, due to an error the first time they attempted to take them.

113.    At about 6:00 a.m., Neal was called for his arraignment.  Mr. Curley asked if he could go with him, telling the police that he was his father and a lawyer wishing to represent him, but he was not allowed to accompany Neal.

114.    Neal accepted the adjournment in contemplation of dismissal (ACD) that was offered to him by the District Attorney.

115.    Mr. Curley was called for his arraignment at about 8:00 a.m.  He was represented by a lawyer from the Legal Aid Society, who informed him that the charges against him were two counts of disorderly conduct and one charge of parading without a permit and told him that the District Attorney was offering him an ACD.  Mr. Curley accepted it.

116.    After they were released, the Curleys went to retrieve their property at a trailer the police had set up for this purpose.  Neal's iPod had been damaged by the police and needed to be replaced.  Another arrestee told Neal that he would have to go to the District Attorney's office to get his cameras back.  Representatives of the District Attorney's office told Neal that because Neal was not yet in the system, he could not get the release he needed from the District Attorney in order to retrieve his cameras.

117.    On September 3, 2004, Neal returned to New York City and went to the District Attorney's office to obtain the paperwork necessary to retrieve his cameras.  He was able to do so and later retrieved his cameras.

118.    Neal is applying to colleges this fall and is concerned about schools' performing background checks and asking applicants about their arrest records.

119.    The Curleys were extremely dismayed that their evening plans were ruined and that they had the added burden of having to return to New York City for their property.  They were also disappointed that New York City does not respect the hallowed place that protest has in our democracy.

## JURY DEMAND

120.    Plaintiffs demand a jury trial on each and every one of their claims.


## CAUSES OF ACTION


121.    The defendants' policy and practice of using of mass-arrest tactics—including the use of

netting to effect arrests—at the Republican National Convention to arrest the plaintiffs violated

their rights under the First, Fourth, and Fourteenth Amendments Amendment of the United States

Constitution; 42 U.S.C. § 1983; Article I, Section 8 and Article I, Section 12 of the New York

State Constitution; and the common law of New York.


122.    The defendants' policy and practice of detaining those arrested for minor offenses at

Republican National Convention demonstrations for unreasonably long periods of time in

unhealthy conditions violated the plaintiffs' rights under the First, Fourth, and Fourteenth

Amendments Amendment of the United States Constitution; 42 U.S.C. § 1983; Article I, Section 8

and Article I, Section 12 of the New York State Constitution; section 140.20 of the New York

Criminal Procedure Law, and the common law of New York.


123.    The defendants' policy and practice of systematically fingerprinting those arrested for

minor offenses at the Republican National Convention violated the plaintiffs' rights under section

160.10 of New York Criminal Procedure Law and the common law of New York State.


        WHEREFORE, the plaintiffs request that this court:

(1)     Assume jurisdiction over this matter;

(2)     Issue a declaratory judgment that the defendants' policy and practice of using mass arrest tactics during the Republican National Convention to arrest the plaintiffs violated their rights under the First, Fourth Amendments and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; Article I, Section 8 and Article I, Section 12 of the New York State Constitution; and the common law of New York;

(3)     Issue a declaratory judgment that the defendants' policy and practice of detaining those arrested for minor offenses during the Republican National Convention for unreasonable periods of time in unhealthy conditions violated the plaintiffs' rights under the First, Fourth and Fourteenth Amendments; 42 U.S.C. § 1983; Article I, Section 8 and Article I, Section 12 of the New York State Constitution; section 140.20 of the New York Criminal Procedure Law, and the common law of New York;

(4)     Issue a declaratory judgment that the defendants' policy and practice of routinely fingerprinting individuals arrested during the Republican National Convention violated section 160.10 of the New York Criminal Procedure Law and New York common law;

(5)     Issue an injunction requiring defendants to return to the plaintiffs, or where necessary to expunge, all fingerprints taken in conjunction with their arrests along with all other information or records about their arrest;

(6)     Award compensatory damages to each of the plaintiffs;

(7)     Award the plaintiffs attorneys' fees and costs; and

(8)     Grant any other relief the court deems appropriate.


                        Respectfully submitted,

                        NEW YORK CIVIL LIBERTIES UNION
                        FOUNDATION, by


                        _____
                        CHRISTOPHER DUNN (CD 3991)
                        ARTHUR EISENBERG (AE 2012)
                        DONNA LIEBERMAN (DL 1268)
                        PALYN HUNG (PH 8007)
                        New York Civil Liberties Union Foundation
                        125 Broad Street, 17th Floor
                        New York, N.Y. 10004
                        (212) 344-3005

                        Counsel for the Plaintiffs

Dated: October 7, 2004
         New York, N.Y.

On the complaint:

DAVID BILLINGS*
Law Student
New York University School of Law
Civil Rights Clinic

ALICIA D'ADDARIO*
Law Student
New York University School of Law
Civil Rights Clinic

ALISON PAGE*
Law Student
New York University School of Law
Civil Rights Clinic

*Plaintiffs and the NYCLU Foundation will be seeking leave of court to permit these students to serve as attorneys in this matter pursuant to the Southern District's Plan for Student Practice in Civil Actions.