```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - :
MICHAEL SCHILLER, et al.,           :  04 Civ. 7922 (KMK) (JCF)
                                    :
                Plaintiffs,         :
                                    :
    - against -                     :
                                    :
THE CITY OF NEW YORK, et al.,       :
                                    :
                Defendants.         :
- - - - - - - - - - - - - - - - - - :
HACER DINLER, et al.,               :  04 Civ. 7921 (KMK) (JCF)
                                    :
                Plaintiffs,         :
                                    :
    - against -                     :
                                    :
THE CITY OF NEW YORK, et al.,       :
                                    :
                                    :
                Defendants.         :
- - - - - - - - - - - - - - - - - - :
TARASIK ABDELL, et al.,             :
                Plaintiffs,         :  05 Civ. 8453 (KMK) (JCF)
                                    :
    - against -                     :
                                    :      MEMORANDUM
                                    :      AND  ORDER
THE CITY OF NEW YORK, et al.,       :_____
                                    :
                                    :
                Defendants.         :
- - - - - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

These cases concern the arrests of persons protesting in
connection with the Republican National Convention (the "RNC") in
2004. The Schiller and Abdell cases arise from arrests near the
World Trade Center site on August 31, 2004 during a march organized
by the War Resisters League (the "WRL").    The defendants

1

(hereinafter "the City") have moved pursuant to Rule 45(2)(c)(2)(B) of the Federal Rules of Civil Procedure to require the WRL and Frida Berrigan, both non-parties to the litigation, to produce documents responsive to a subpoena issued on September 28, 2005. The City has also moved pursuant to Rule 37(a)(2)(A) to compel the Abdell plaintiffs to produce related documents. Finally, the City has moved to compel Ed Hedemann, who is a plaintiff in Abdell, to provide the City with releases so that the City may obtain documents related to his arrests on occasions unrelated to the RNC. For the reasons described below, the City's motions to compel production are denied in part and granted in part, and the City's motion to compel Mr. Hedemann to execute the requested releases is granted.

Background

A. August 31, 2004 Protest

The WRL is a pacifist anti-war organization. On August 31, 2004, the second day of the RNC, the WRL organized a vigil, march, and "die-in" to protest the wars in Iraq and Afghanistan and the "war on terror." The vigil was to take place at the World Trade Center site. From there, participants planned to march two abreast on the sidewalk to Union Square. From Union Square, participants were to proceed to Madison Square Garden, where some would knowingly risk arrest by participating in the die-in. ("Basic Scenario for Civil Disobedience at the RNC," attached as Exh. F to

Letter of Fred M. Weiler dated Oct. 6, 2006 ("Weiler 10/6/06 Letter")).  According to a press release issued by the WRL on August 30, 2004, the protest was part of a "full day of nonviolent direct actions in coordination with the A31 Action Coalition."  The WRL noted that no permits had been sought or granted for any of these events.  (Press Release, attached as Exh. F to Weiler 10/6/06 Letter).

The plaintiffs allege that on August 31, 2004, as protesters gathered near the World Trade Center site, the police informed the organizers that the group could march "as long as they remained on the sidewalk, obeyed traffic laws, and walked two-by-two." (Schiller First Amended Complaint ("Schiller Complaint"), ¶ 3). The police then stopped the march soon after it began and, "without giving people a meaningful opportunity to disperse," arrested more than two hundred people who were standing on the sidewalk. (Schiller Complaint, ¶ 3; see also Abdell Amended Complaint, ¶¶ 20-23).  The plaintiffs in Schiller and Abdell were among those arrested on this occasion.[1]  (Schiller Complaint, ¶¶ 6-9; Abdell Amended Complaint, ¶¶ 3-4).

---

[1] Although the disputed subpoenas were issued in Schiller and Dinler, the Dinler case arises from arrests that took place later on the evening of August 31, 2004, during the "A31 Street Party" at Union Square.  (Dinler First Amended Complaint, ¶ 3).  There is no indication that the WRL was involved in organizing the A31 Street Party.

B. Subpoenas

On September 28, 2005, the defendants served subpoenas on the WRL and Frida Berrigan, who had represented the WRL publicly in connection with RNC-related protests.  (Subpoenas, attached as Exhs. A and B to Weiler 10/6/06 Letter; Letter of Vera M. Scanlon and Myron Beldock dated Nov. 2, 2006 ("Scanlon and Beldock 11/2/06 Letter"), at 2 n.2; Affidavit of Frida Berrigan dated Nov. 30, 2006 ("Berrigan Aff."), attached to Scanlon and Beldock 11/2/06 Letter, ¶¶ 6, 9).  Neither the WRL nor Ms. Berrigan is a party to any RNC-related action.  On the same date, the defendants served an identical subpoena on Ed Hedemann, a member of the WRL who is also a plaintiff in Abdell.  (Subpoena, attached as Exh. C to Weiler 10/6/06 Letter).  The subpoenas commanded Ms. Berrigan, Mr. Hedemann, and the "President or other Officer" of the WRL to appear for deposition, and to produce

> [a]ny and all documents . . . that relate or refer to any plans to organize or to engage in civil disobedience, protest(s), march(es), rallies or other events at any time during the Republican National Convention in New York City during the end of August and beginning of September 2004 (including but not limited to the World Trade Center vigil on 8/31/04).

(Subpoenas, attached as Exhs. A, B, and C to Weiler 10/6/06 Letter).

On October 5, 2005, Rachel Meeropol, acting on behalf of the WRL and Ms. Berrigan, objected to the subpoenas on the grounds that they were overbroad and vague.  (Letter of Rachel Meeropol dated

4

Oct. 5, 2005 ("Meeropol 10/5/05 Letter"), attached as Exh. D to Weilar 10/6/06 letter, at 2). Ms. Meeropol also stated that the subpoenas violated "the core First Amendment protection against government infringement on freedom of speech, assembly and association." (Meeropol 10/5/05 Letter at 2).

In August 2006, the City wrote to Myron Beldock, who had replaced Ms. Meeropol as counsel for the WRL and Ms. Berrigan. The City stated that in response to their concerns, it would modify its request to seek the following documents:

> Any and all documents relating to civil disobedience, unlawful activity, or activity without a permit when such activity would otherwise require a permit, in connection with any protests, demonstrations, marches, rallies, processions, parades, vigils, or like events during August 21-September 4, 2004 . . . [as well as a]ny and all documents reflecting communications by the WRL with the City of New York relating to obtaining a permit for any protests, demonstrations, marches, rallies, processions, parades, vigils or like events scheduled to take place between August 21-September 4, 2004.

(Letter of Fred M. Weiler dated Aug. 16, 2006 ("Weiler 8/16/06 Letter"), attached as Exh. E to Weiler 10/6/06 Letter, at 1).

After being notified that Mr. Hedemann is a plaintiff in Abdell, the City withdrew the subpoena issued to him and sought the same documents by way of a discovery request. (Letter of Alan Levine dated Nov. 1, 2006 ("Levine 11/1/06 Letter"), at 1 n.1). In response to this request, Mr. Hedemann produced a number of documents from his own files, including WRL flyers, press releases, and other materials related to the August 31, 2004 demonstration.

(Weiler 10/6/06 Letter at 2; Levine 11/1/06 Letter at 3).  He also produced redacted minutes from WRL meetings on July 28, August 12, and August 19, 2004, at which WRL members discussed their plans for the upcoming demonstration.  (Minutes, attached as Exh. G to Weiler 10/6/06 Letter).  The redacted portions of these minutes contain the names of WRL members, "discussions of ideas and political perspectives, possible activities that were not adopted by the WRL, and notes about matters unrelated to the August 31, 2004 political activity."  (Berrigan Aff., ¶¶ 6-7).  The WRL and Ms. Berrigan have informed the City, in response to its revised subpoena, that they will not produce any documents other than the ones already produced by Mr. Hedemann.  (Scanlon and Beldock 11/2/06 Letter at 3).

The City now requests an order compelling the WRL and Ms. Berrigan to produce documents responsive to the subpoenas.  The City also seeks an order compelling the <u>Abdell</u> plaintiffs, including Mr. Hedemann, to produce unredacted versions of the minutes of any WRL meetings at which the August 31, 2004 protest was discussed.[2]  Citing the First Amendment guarantees of freedom of speech and freedom of association, the WRL and Ms. Berrigan have

---

[2] Specifically, the City seeks an order compelling the <u>Abdell</u> plaintiffs to produce "unredacted copies of the minutes of all meetings of the WRL during which there was: (1) any discussion of or planning for the WRL's August 31, 2004 march at Church and Fulton Streets . . . or (2) any discussion of the WRL's communication with (or coordination with) the A-31 Action Coalition."  (Letter of Jeffrey A. Dougherty dated Sept. 13, 2006 ("Dougherty 9/13/06 Letter") at 1-2).

moved to quash the subpoenas and the <u>Abdell</u> plaintiffs have opposed the motion to compel production.

   C. <u>Mr. Hedemann's Arrest Records</u>

   In response to an interrogatory from the City, plaintiff Ed Hedemann stated that, aside from his arrest at the RNC, he had been arrested five times in the past ten years. Four of those arrests took place prior to August 31, 2004. Two of these were in Manhattan, one was in Washington, D.C., and one was in Arlington, Virginia. Mr. Hedemann also identified one arrest in Brooklyn subsequent to the RNC.[3]  With the exception of the arrest in Virginia, for which he was convicted and incarcerated for two days, Mr. Hedemann stated that he was not convicted or incarcerated after any of these arrests. (Spiegel 2/7/06 Letter at 1). The City has requested that Mr. Hedemann provide releases so that the City can obtain sealed documents related to these arrests, and Mr. Hedemann has refused to do so. Accordingly, the City now seeks an order compelling Mr. Hedemann to execute the releases.[4]

---

   [3] The City mistakenly states that Mr. Hedemann has identified "five occasions that he was arrested prior to his arrest at Church/Fulton Streets on August 31, 2004." (Letter of Jeffrey A. Dougherty dated Oct. 6, 2006 ("Dougherty 10/6/06 Letter"), at 1). In fact, as noted, one of the arrests identified by Mr. Hedemann occurred on March 19, 2005. (Letter of Michael L. Spiegel dated Feb. 7, 2006 ("Spiegel 2/7/06 Letter"), attached as Exh. A to Dougherty 10/6/06 Letter, at 1).

   [4] Since Mr. Hedemann's 1998 arrest in Virginia resulted in a conviction, the City should not need a release in order to obtain records relating to that arrest. Records relating to Mr. Hedemann's other arrests are presumably sealed pursuant to New York

Discussion

    A. <u>WRL Minutes</u>

    As noted above, Mr. Hedemann has turned over to the City redacted minutes from three WRL meetings.  The City now seeks unredacted copies of those minutes.

        1. <u>Names of WRL Members</u>

    The WRL, Ms. Berrigan, and Mr. Hedemann object to disclosure of the names of WRL members on the grounds that such disclosure would infringe upon the privacy of association and belief guaranteed by the First Amendment.  It is the policy of the WRL to keep the names of its members confidential except for those who choose to identify themselves publicly as members of the organization.  (Berrigan Aff., ¶ 6).  Accordingly, the names of WRL members have been redacted from the minutes produced by Mr. Hedemann.

    The United States Supreme Court recognized in <u>National Association for the Advancement of Colored People v. Alabama ex rel Patterson</u>, 357 U.S. 449 (1958), that the First Amendment and the Due Process Clause of the Fourteenth Amendment protect against compelled disclosure of membership lists where such disclosure would "abridge the rights of [an organization's] rank-and-file members to engage in lawful association in support of their common

_____

Criminal Procedure Law § 160.50 and any equivalent District of Columbia statute.

beliefs." <u>Id.</u> at 460.  The Court noted that the National
Association for the Advancement of Colored People (the "NAACP") had
made "an uncontroverted showing that on past occasions revelation
of the identity of its rank-and-file members has exposed members to
economic reprisal, loss of employment, threat of physical coercion,
and other manifestations of public hostility." <u>Id.</u> at at 462.
Given those circumstances, the Court found that compelled
disclosure of the identities of the NAACP's Alabama members would
hinder the ability of the organization and its members to pursue
their common goals because it might induce members to withdraw or
deter others from joining the organization for fear of exposure.
<u>Id.</u> at 462-63.

     "The First and Fourteenth Amendment right[] of . . . free
association [is] fundamental and highly prized, and 'need[s]
breathing space to survive.'" <u>Gibson v. Florida Legislative</u>
<u>Investigation Committee</u>, 372 U.S. 539, 544 (1963) (quoting <u>NAACP v.</u>
<u>Button</u>, 371 U.S. 415, 433 (1963)).  For this reason, "state action
which may have the effect of curtailing the freedom to associate is
subject to the closest scrutiny." <u>NAACP v. Alabama</u>, 357 U.S. at
460-61; <u>see also</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 64 (1976) ("Since
<u>NAACP v. Alabama</u> we have required that the subordinating interests
of the State must survive exacting scrutiny.").  Accordingly, when
an organization resisting disclosure of the identities of its
members makes a <u>prima</u> <u>facie</u> showing that disclosure would infringe

upon its First Amendment rights, the burden shifts to the party seeking disclosure to show a compelling need for the information. New York State National Organization for Women v. Terry, 886 F.2d 1339, 1355 (2d Cir. 1989). This "[qualified] privilege . . . [is] designed to protect members of groups from harassment and intimidation and to prevent the 'chilling effect' that disclosure may have on the willingness of individuals to associate with the group." International Society for Krishna Consciousness, Inc. v. Lee, No. 75 Civ. 5388, 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985) (internal citations omitted).

The Second Circuit has noted that in order to make out a prima facie showing of infringement,

> [a] party resisting discovery need not make a showing of harm or other coercion; but before the burden shifts to [the party seeking disclosure] to demonstrate the necessary compelling interest in having discovery, [the party resisting discovery] must at least articulate some resulting encroachment on their liberties.

Terry, 886 F.2d at 1355. This encroachment cannot be merely speculative, see Buckley, 424 U.S. at 70, and courts have required parties resisting disclosure to produce "specific evidence of past or present harassment of members due to their associational ties, . . . harassment directed against the organization itself, [or a] pattern of threats or specific manifestations of public hostility." Buckley, 424 U.S. at 74; see also Brown v. Socialist Workers '74 Campaign Committee (Ohio), 459 U.S. 87, 99-101 (1982) (citing numerous instances of recent harassment and surveillance of the

Socialist Workers Party ("SWP") and its members by government and private parties); <u>Doe v. Martin</u>, 404 F. Supp. 753, 756 (D.D.C. 1975) (finding that SWP had made the required showing by producing affidavits that party's members had been harassed by government agencies and private employers); <u>cf.</u> <u>Doyle v. New York State Division of Housing</u>, No. 98 Civ. 2161, 1999 WL 177441, at *8 (S.D.N.Y. March 30, 1999)(party resisting discovery had shown "neither a history of retaliation nor even a commonsense practical likelihood of retaliation").

However, "[m]indful of the crucial place speech and associational rights occupy under our constitution," the Second Circuit has emphasized that "in making out a <u>prima facie</u> case of harm the burden is light." <u>Terry</u>, 886 F.2d at 1355; <u>accord</u> <u>United States v. Citizens State Bank</u>, 612 F.2d 1091, 1094 (8th Cir. 1980) (party resisting subpoena has initial burden of showing "arguable First Amendment infringement"); <u>Anderson v. Hale</u>, No. 00 C 2021, 2001 WL 503045, at *3 (N.D. Ill. May 10, 2001)("concrete showing of infringement" unnecessary to assert privilege).

Mr. Hedemann, Ms. Berrigan, and David McReynolds (a longtime member and former employee of the WRL) have submitted uncontroverted affidavits describing a long history of government surveillance of the WRL and its members.  (Berrigan Aff., ¶ 18; Affidavit of Ed Hedemann dated Nov. 1, 2006 ("Hedemann Aff."), attached as Exh. A to Levine 11/1/06 Letter, ¶¶ 4-6; Affidavit of

David McReynolds dated Oct. 30, 2006 ("McReynolds Aff."), attached to Scanlon and Beldock 11/2/06 Letter, ¶¶ 3, 6-7, 9-12). The affiants gained much of their knowledge of this surveillance from reviewing files maintained by the Federal Bureau of Investigation (the "FBI"). For example, Mr. Hedemann states that in reviewing his FBI file, he discovered that various government agencies reported to the FBI about him, sent covert government agents to meetings that he attended and demonstrations that he organized, and questioned his neighbors about him. (Hedemann Aff., ¶ 6). According to the affidavits, the WRL was targeted by the federal government's infamous COINTELPRO program during the early 1970s, and in 1969 the organization's offices were vandalized and its files stolen. (Hedemann Aff., ¶¶ 4-5; McReynolds Aff., ¶ 11).

Admittedly, much of the government surveillance and harassment described in these affidavits took place several decades ago. However, the affidavits describe the belief of many WRL members, based on news reports and documents released pursuant to Freedom of Information Act requests, that federal and local government agencies continue to monitor the activities of anti-war organizations and their members. (Berrigan Aff., ¶ 18; McReynolds Aff., ¶ 12). "Some members of WRL maintain a relatively low profile and do not participate in [the organization's] more public activities" for fear of subjecting themselves to government scrutiny. (Berrigan Aff., ¶ 19). Other members choose to keep

their membership in the organization private because, given the organization's dissident stance, they fear adverse employment consequences if their beliefs are made public. (Berrigan Aff., ¶¶ 16, 19; McReynolds Aff., ¶¶ 7-8). It is therefore reasonable to believe that potential WRL members would be deterred from joining, and current members dissuaded from active participation, if they thought that their membership in the organization would be made public.[5]

Although the City alleges that these fears are "exaggerated and baseless" (Weiler 11/20/06 Letter at 2), it has provided no evidence to contradict the affidavits submitted by Ms. Berrigan, Mr. Hedemann, and Mr. McReynolds. As noted above, organizations resisting discovery on freedom of association grounds bear a minimal burden of proof. The WRL, Ms. Berrigan, and the Abdell plaintiffs have provided sufficient evidence to shift the burden onto the City to show a compelling need to obtain the names of WRL members.

The City first asserts that it is entitled to the names of WRL members who are plaintiffs in RNC-related cases because the City is

_____

[5] The City suggests that fear of public disclosure of WRL members' identities could be allayed by designating the unredacted minutes "attorneys'-eyes-only." However, "[i]t is the government itself that Plaintiffs fear, and therefore confining the information to government . . . counsel will hardly assuage those fears or avoid the intimidation that Plaintiffs fear might follow." International Action Center v. United States, 207 F.R.D. 1, 3 (D. D.C. 2002).

"entitled, in examining any WRL member/plaintiff at deposition, to learn what such plaintiff intended and knew beforehand of WRL's plans for the march." (Weiler 11/20/06 Letter at 3). The City is certainly entitled to ask the plaintiffs at deposition whether they were aware of the WRL's plans for civil disobedience, and whether they intended to violate the law on the day they were arrested. However, since the WRL's plans for the protest were publicly available, there is no need to determine whether a particular plaintiff is a WRL member, or was present at WRL planning meetings, in order to determine whether he or she knew of the organization's plans. The minimal relevance of a plaintiff's membership in the WRL or presence at a WRL planning meeting is insufficient to meet the City's burden of showing a "compelling interest in having discovery." Terry, 886 F.2d at 1355; see also Anderson, 2001 WL 503045, at *4 ("[T]he inquiring party must show that the information sought is so relevant that it goes to the 'heart of the matter'; that is, the information is crucial to the party's case.").

The City also maintains that it is entitled to the names of any WRL members present at the meetings who are non-party arrestees. The City argues that "if persons who were arrested [during the RNC] had also been advocating unlawful conduct at a WRL planning meeting, that intention would go a long way toward rebutting" the plaintiffs' claims that the defendants implemented

a policy of indiscriminate "sweep" arrests.[6] (Weiler 11/20/06 Letter at 2). The logic of the City's argument is not immediately apparent, but in any case, statements made by individual non-party arrestees at WRL meetings would add little to the City's defense. The City has already obtained numerous statements regarding the WRL's plans to engage in civil disobedience and can depose the plaintiffs regarding their intentions. The marginal value of statements by non-party arrestees regarding their intent to violate the law cannot overcome the associational rights of the WRL and its members.

The City has failed to demonstrate a compelling need for the names of WRL members, and the motions to compel production are therefore denied to the extent that they seek that information.

2. <u>Other Redacted Information</u>

In addition to redacting the names of WRL members, Mr. Hedemann has redacted "discussions of ideas and political perspectives, possible activities that were not adopted by the WRL, and notes about matters unrelated to the August 31, 2004 political activity." (Berrigan Aff., ¶ 7).

The unredacted portions of the minutes produced by Mr. Hedemann reflect decisions made by the WRL regarding the vigil,

---

[6] The plaintiffs make this argument under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978), which held that local government can be held liable under 42 U.S.C. § 1983 if state actor acts unconstitutionally pursuant to government policy or custom.

march, and die-in that was to take place on August 31, 2004.  For
example, the minutes from August 19, 2004 state that once the group
reached Madison Square Garden, the WRL "concluded not to go through
the barricades and that we should cluster together.  We all did
agree to die in the streets and not on the sidewalk . . . .  We
concluded to keep it completely silent."  (Minutes of WRL Meeting
on August 19, 2004, attached as Exh. G to Weiler 10/6/06 Letter).
As the City points out, whether or not those who took part in the
march intended to violate the law is relevant to the issue of
whether the NYPD had probable cause to arrest the plaintiffs.  The
WRL's plans for the march are therefore clearly relevant and
discoverable.  Accordingly, Mr. Hedemann has produced WRL documents
made public before the protest, as well as those portions of the
minutes that reflect the WRL's plans for the August 31, 2004
protest.

        The redacted information, by contrast, is not relevant to any
claim or defense in this litigation. The WRL's internal political
discussions are clearly irrelevant to the issue of the plaintiffs'
intent.  Furthermore, whether WRL members discussed other courses
of action is irrelevant to what the organization ultimately agreed
to do during the protest.  Suggestions that were considered and
rejected by the organization have no bearing on whether the
plaintiffs intended to engage in civil disobedience at the World
Trade Center site.  Finally, discussions of matters unrelated to

16

the August 31, 2004 protest are irrelevant unless, as explained below, they relate to plans made by the WRL or another organization to engage in civil disobedience on other dates during the RNC. Accordingly, the City's motion to compel production of unredacted versions of the minutes is denied.[7]

B. Other Documents

In addition to the unredacted minutes, the City seeks to compel the production of a number of additional documents. First, the City seeks from the WRL and Ms. Berrigan any documents that reflect plans made by the WRL or any other organization to engage in unlawful activity during the RNC other than the August 31, 2004 vigil, march, and die-in. (Weiler 8/16/06 Letter at 1). The City does not contend that the WRL was involved in planning any RNC-related protests other than these. However, it may be that the WRL did plan another protest, or that the WRL or Ms. Berrigan have documents, such as notices or flyers, related to protests planned by other organizations. If that is the case, those documents shall

---

[7] The City has also moved to compel production by Mr. Hedemann of any WRL meeting minutes containing discussion of the WRL's "communication with (or coordination with) the A-31 Action Coalition." (Dougherty 9/13/06 Letter at 2). As noted above, the WRL is not obligated to produce documents that reflect discussions of ideas, political perspectives, or tactics ultimately rejected by either the WRL or the A-31 Action Coalition. On the other hand, the WRL's meeting minutes may contain statements regarding the A-31 Action Coalition's plans for the "full day of nonviolent direct actions" that was to take place on August 31, 2004. Such statements are relevant and must be produced if they exist.

be produced to the extent that they contain information regarding plans for civil disobedience that may be relevant to the intent of plaintiffs in an RNC-related civil action.

The City also seeks from the WRL and Ms. Berrigan any documents reflecting communications with the City related to obtaining a permit for the August 31, 2004 march from the World Trade Center site to Madison Square Garden.[8]  (Weiler 8/16/06 Letter at 1).  The City contends that "[w]hether WRL contemplated or made efforts to obtain a permit for the Church/Fulton march [] bears on WRL's intent and the intent of participants," since those arrested at the World Trade Center site were charged with parading without a permit.  (Weiler 10/6/06 Letter at 5).

As noted above, a press release issued by the WRL on August 30, 2004 indicates that no permits were sought for any of the August 31, 2004 protests coordinated by the A-31 Action Coalition. (Press Release, attached as Exh. F to Weiler 10/6/06 Letter).  For this reason, it seems unlikely that any documents responsive to this request actually exist.  In any case, however, what is relevant here is not whether the WRL attempted to get a permit for the march, but whether the plaintiffs were aware that no permit was

_____

[8] The City's subpoena seeks any documents related to obtaining a permit for any RNC-related protest.  However, as noted above, it does not appear that the WRL planned any RNC-related protests other than the one that took place on August 31, 2004.  In its motion to compel production, the City argues only that documents reflecting efforts to secure a permit for the August 31 march are relevant. (Weiler 10/6/06 Letter at 5).

obtained.  Documents reflecting communications between the WRL and the City regarding a permit would reveal nothing about whether the plaintiffs knew that the march in which they participated was not authorized by the City.  The WRL and Ms. Berrigan are therefore not required to produce documents reflecting communications with the City regarding a permit for the march.

    C. Hedemann Arrest Records

    Finally, the City has moved to compel Mr. Hedemann to produce releases to permit the City to obtain his arrest records.  The City correctly points out that "documents detailing [Mr. Hedemann's] prior arrest experiences, previous arrest processing, and criminal court proceedings are relevant to refute [his] claims regarding the cause and extent of emotional distress damages attributable to his August 31, 2004 arrest and confinement." (Dougherty 10/6/06 Letter at 2).  Whether or not they will ultimately be admissible at trial, Mr. Hedemann's arrest records are relevant to the issue of damages for emotional distress.[9]  See Green v. Baca, 226 F.R.D. 624, 656-57 (C.D. Cal. 2005).  Furthermore, if Mr. Hedemann's prior arrests involve disorderly conduct, parading without a permit, or similar charges, the records may lead to information that would cast doubt upon Mr. Hedemann's credibility with respect to his contention that

_____

    [9] Assuming that the City is also seeking a release for records related to the 2005 arrest, Mr. Hedemann must provide a release for that arrest as well because subsequent arrests are relevant to damages for ongoing mental and emotional distress.

the NYPD lacked probable cause to arrest him on August 31, 2004. Accordingly, the City's motion to compel Mr. Hedemann to execute releases so that the City may obtain his arrest records is granted.

Conclusion

For the reasons set forth above, the defendants' motions to compel production of WRL documents are granted in part and denied in part. The defendants' motion to compel Mr. Hedemann to execute releases for the unsealing of his arrest records is granted.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
     December 7, 2006

Copies mailed this date:

Vera M. Scanlon, Esq.
Myron Beldock, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue
New York, New York 10016

Alan Levine, Esq.
99 Hudson Street, 14th Floor
New York, New York 10013

Michael L. Spiegel
111 Broadway, Suite 1305
New York, New York 10006

20

Fred M. Weiler, Esq.
Jeffrey A. Dougherty, Esq.
Assistant Corporation Counsel
100 Church Street
New York, New York 10007