# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 04 Civ. 7921 (RJS) (JCF)

HACER DINLER, *et al.*,

Plaintiffs,

VERSUS

THE CITY OF NEW YORK, *et al.*,

Defendants.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9 | 30 | 2012

## CONSOLIDATED RNC CASES

OPINION AND ORDER
September 30, 2012

RICHARD J. SULLIVAN, District Judge:

Beginning in 2004, Plaintiffs filed these actions against the City of New York (the "City") and several individuals pursuant to 42 U.S.C. § 1983 and various provisions of state law, alleging violations of their state and federal constitutional rights in connection with mass arrests at demonstrations relating to the 2004 Republican National Convention (the "RNC" or "Convention"). Before the Court are the parties' cross-motions for summary judgment on Plaintiffs' false arrest claims relating to their arrests at Fulton Street and East 16th Street, and on Defendants' policies with respect to fingerprinting and arrests on minor violations during the RNC.

Additionally, Plaintiffs have moved to strike testimony by New York Police Department ("NYPD") Deputy Commissioner David Cohen, which they allege is improper expert evidence. For the reasons set forth below: (1) Plaintiffs' motion for summary judgment with respect to the Fulton Street arrests is granted, and Defendants' motion is denied; (2) the parties' cross-motions for summary judgment with respect to the East 16th Street arrests are denied; (3) Plaintiffs' motion for summary judgment with respect to their state law fingerprinting claims is granted, and Defendants' motion is denied; (4) Defendants' motion for summary judgment regarding the constitutionality of

the City's policies concerning fingerprinting and arrests during the RNC is granted; and (5) Plaintiffs' motion to strike certain testimony of Deputy Commissioner Cohen is denied.

## I.   BACKGROUND[1]

During the 2004 Republican National Convention, which was held at Madison Square Garden in Manhattan, thousands of individuals representing a wide range of political and social views came to New York City to participate in demonstrations relating to the RNC. Those demonstrations led to mass arrests and detention of protestors. Following those mass arrests, hundreds of plaintiffs filed the instant lawsuits against the City and various individual NYPD officers and other individuals associated with the City (collectively, "Defendants").[2]

Plaintiffs in the various cases include protesters, journalists, and bystanders.[3]

The first Plaintiffs filed these actions in late 2004, shortly after the arrests in question, followed by hundreds more Plaintiffs filing individually, jointly, and, in some cases, seeking to certify a class. The complaints in these actions raise claims of, *inter alia*, false arrest, unreasonable and unhealthy terms of confinement, and unlawful fingerprinting and detention policies. The cases were referred to Judge Francis for discovery and assigned to my docket on October 2, 2007. By Opinion and Order dated May 19, 2011, the Court granted in part and denied in part Plaintiffs' motion for class certification in *MacNamara v. City of New York*, 275 F.R.D. 125 (S.D.N.Y. 2011). Discovery concluded on September 16, 2011.

The parties filed cross-motions for summary judgment on October 3, 2011; the motions were fully submitted as of November 23, 2011. On December 1, 2011, Plaintiffs in *Schiller* and *Dinler* submitted a letter seeking leave to file a motion to strike Cohen's testimony.[4] Defendants submitted a letter opposing this request on December 6, 2011. By Order dated December 14, 2011, the Court deemed Plaintiffs' motion to

---

[1] The following facts are drawn from the parties' Rule 56.1 Statements, and the exhibits and declarations attached thereto. The facts are undisputed unless otherwise noted. Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. The Court has also considered the parties' briefs in connection with their motions. The various submissions and briefs will be referred to as follows: [party name] [subject of motion] [type of document]. For example, the Rule 56.1 Statement submitted by Defendants in connection with their motion for summary judgment on Plaintiffs' false arrest claims arising out of the August 31, 2004 arrests at Fulton Street is called "Defs.' Fulton 56.1"; the *Schiller* Plaintiffs' brief opposing Defendants' motion for summary judgment dismissing Plaintiffs' claims relating to the No-Summons and Fingerprinting Policies is called "Schiller Policies Opp'n Br."

[2] Although the Plaintiffs in the various cases did not sue identical groups of Defendants – indeed, not all Plaintiffs even named the City as a Defendant – the Court nevertheless refers to the City and various individual Defendants collectively as "Defendants" unless otherwise noted.

[3] This Opinion and Order refers to several sets of Plaintiffs. The *Dinler* and *Adams* Plaintiffs were arrested in connection with the East 16th Street demonstration. The *Schiller* and *Abdell* Plaintiffs were arrested in connection with the Fulton Street march. The *MacNamara* Plaintiffs were arrested at various sites throughout the City and, for purposes of this Opinion and Order, join the other Plaintiffs in challenging the arrests at the Fulton and East 16th Street demonstrations and the constitutionality of several law enforcement policies adopted by the City to address security concerns during the RNC.

[4] Several Plaintiffs submitted letters to the Court joining in the *Schiller* and *Dinler* Plaintiffs' motion to strike.

strike made and determined that it would address the motion when it ruled on the parties' cross-motions for summary judgment, based on the parties' letters and arguments already contained in the summary judgment briefing. On May 31, 2012, the Court heard oral argument regarding the parties' motions.

Although these cases cover a wide range of complaints about conduct by the City, and particularly the NYPD, the parties agreed to limit their motions at this time to four issues: (1) whether the police had probable cause to arrest protesters and bystanders at a demonstration on Fulton Street on August 31, 2004; (2) whether the police had probable cause to arrest protesters and bystanders at a demonstration on East 16th Street on August 31, 2004; (3) whether the City's suspension of its summons policy for minor offenses, when those offenses related to the RNC, was constitutionally permissible; and (4) whether the City's blanket fingerprinting policy with respect to RNC-related arrests was lawful and constitutionally permissible.

In all, the parties have filed more than fifty motions, together with hundreds of pages of briefing and thousands more pages of declarations, exhibits, and Local Rule 56.1 statements, as well as several hours of video of the events surrounding the Fulton Street and East 16th Street arrests.

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of proving that there

is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (citations and internal quotation marks omitted).

In ruling on a motion for summary judgment, the court must resolve any ambiguity in favor of the nonmoving party. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Specifically, where, as here, the events in question are captured on videos that are not alleged to have been doctored or altered, the court should "view[] the facts in the light depicted by the videotape." *Id.* at 381.

As a result, summary judgment will not issue where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral summary judgment motion." *Ferrigno v. U.S. Dep't of Homeland Sec.*, No. 09 Civ. 5878 (RJS), 2011 WL 1345168, at *3 (S.D.N.Y. Mar. 29, 2011).

### III. FALSE ARREST CLAIMS

Plaintiffs' false arrest claims arise from mass arrests at two sites made without any warrants. Although the parties do not dispute that warrantless arrests must be supported by probable cause in order to satisfy the Fourth Amendment's requirement that seizures be reasonable, U.S. Const. amend. IV, they disagree over how probable cause determinations must be made when the police suspect large groups of people of unlawful activity. It is to that threshold question that the Court first turns.

### A. Probable Cause

Where an arrest is made without a warrant, "the defendant [in a false arrest case] . . . bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)). Probable cause is a complete defense to a claim of false arrest. *Id.* (citing *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)). Probable cause with respect to *any* charge is sufficient; the police need not have had probable cause with respect to each individual charge. *Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012).

"'An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Dickerson*, 604 F.3d at 751 (quoting *Jaegly*, 439 F.3d at 152). Importantly, probable cause must be particular to the individual being arrested. The Supreme Court has held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person" because "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). In *Ybarra*, the police had a warrant to search a tavern based on information that a bartender possessed drugs, but searched everyone present, including the petitioner. *Id.* at 88. The Court concluded that the authorities lacked probable cause to believe that anyone other than the bartender was violating the law, and that such probable cause remained absent with respect to the petitioner when the police executed the warrant. *Id.* at 90-91. The requirement of individualized probable cause, the Court ruled, "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* at 91. The Supreme Court recently reaffirmed that, notwithstanding the difficulty of defining probable cause precisely, "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Ybarra*, 444 U.S. at 91) (internal quotation marks and further citations omitted).

Defendants, at least for purposes of these motions, do not contend that the arresting officers had individualized knowledge of the actions of any of the Plaintiffs.[5] Instead,

---

[5] On June 20, 2006, Judge Francis issued an order deeming Defendants to have conceded that they "have no personal knowledge of [the *Schiller* and *Dinler*] plaintiffs' actions." (No. 04 Civ. 7922 (RJS) (JCF), Doc. No. 67, at 3.) Similarly, by Order dated November 28, 2006, Judge Francis ruled that "the defendants are deemed to have admitted that, with respect to each plaintiff in the *MacNamara*, *Abdell*, and *Adams* case[s] (with the exception of plaintiff

Defendants rest entirely on a concept that the Court will refer to as "group probable cause," which they assert permits the police to arrest an entire group of individuals "where it reasonably appears to the police that a large group is engaging in unlawful conduct." (Defs.' Fulton Mem. 9.)

The concept of group probable cause, however, is by no means as firmly established as Defendants suggest. The Second Circuit, in fact, rejected a comparable argument in *Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006). In that case, brought by protestors arrested on private property, the Second Circuit affirmed the district court's finding that the police were not entitled to qualified immunity because their conduct was unreasonable insofar as it was not based on individualized probable cause. *Parmley*, 465 F.3d at 60. The arrests were predicated on the conduct of a subset of protestors who, allegedly in violation of a state statute prohibiting obstruction of traffic, stepped into the nearby interstate to distribute literature about their cause before rejoining the larger group. *Id.* at 52-53. Although the Second Circuit assumed *arguendo* that some protestors had indeed violated the state statute, it found the police officers' conduct to be unreasonable because, at the time of the arrests, none of the officers could identify the specific protestors responsible for the violations. The court stated that, "[w]ithout the ability to identify those individuals who had

entered the . . . roadway, defendants cannot rely on [the state statute prohibiting obstruction of traffic] to justify their actions." *Id.* at 60. Thus, even though some arrestees may indeed have violated the law, the court found that the "indiscriminate mass arrests" were "without probable cause." *Id.*

In arguing for the group probable cause theory, Defendants rely primarily on two cases from outside the Second Circuit: *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009) and *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). In *Carr*, the Court of Appeals for the District of Columbia reversed the district court's grant of summary judgment in favor of protesters who were arrested on charges of rioting. 587 F.3d at 402. In light of evidence that the group moving through the city seemed to be *collectively* carrying torches and celebrating destruction of property by protesters, the court ruled that there were disputed issues of fact as to whether the police had probable cause to arrest the roughly sixty-five to seventy-five protesters who either voluntarily entered or were "herded" by police into an alley. *Id.* at 404-06. Specifically, the court concluded that "[a] requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot, particularly when it is on the move – at night." *Id.* at 408. Instead, the court held that, in the context of rioting, the police "must only be able to form a reasonable belief that the *entire* crowd is acting as a unit and therefore *all* members of the crowd violated the law." *Id.* (emphasis added). The court conceded the possibility that an innocent person could be mistaken for a rioter and arrested, but it noted that "[p]robable cause only requires a reasonable belief of guilt, not a certitude." *Id.* Importantly, the court distinguished a prior case, *Barham v. Ramsey*, in which the D.C.

---

Chris Thomas [who was observed by an NYPD officer at the New York Public Library]), they cannot identify any member of the NYPD who has personal knowledge of individual conduct of that plaintiff which served as the basis for that plaintiff's arrest. This does not preclude the defendants from presenting evidence that a plaintiff was within a group of individuals allegedly engaged in unlawful activity or from arguing that such evidence is sufficient to demonstrate probable cause." (No. 04 Civ. 7922 (RJS) (JCF), Doc. No. 112.)

Circuit ruled that the police lacked probable cause to arrest hundreds of people in a park merely because a subset of those present were protesters who had been participating in traffic offenses and vandalism. 587 F.3d 401 (D.C. Cir. 2006). The *Carr* court noted that "in *Barham* the record showed that many people who could not be tied to illegal activity streamed in and out of the park before the mass arrest," whereas in *Carr*, there was "no affirmative evidence . . . of individuals not associated with the protest being present in the alley." *Carr*, 587 F.3d at 408.

Defendants also rely on *Bernini v. City of St. Paul*, which arose out of the 2008 RNC, where safety concerns relating to protests prompted the police to close access to the downtown area of St. Paul, Minnesota. *See* 665 F.3d at 1001. Despite the closures, a group of protesters nonetheless proceeded toward the restricted area, down the very road that was intended to be the route for the First Lady's motorcade. *Id.* The police formed a barricade at an intersection and told the protesters (who started on the street and moved to the sidewalk) to retreat, before using rubber pellets to compel their dispersal. *Id.* The police reported that protesters threw rocks and bags containing feces, though the plaintiffs disputed this assertion. *Id.* Finally, the police funneled the protesters into a nearby park, instructed the group to sit, and "sort[ed]" people, ultimately letting about 200 go and arresting another 160. *Id.* at 1002. The police contended that those involved appeared to be sitting together. *Id.* Citing the D.C. Circuit's rulings in *Carr* and *Barham*, the Eighth Circuit noted that "[w]hat is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons." *Id.* at 1003. The court thus concluded that the officers

could have determined that the group that appeared ready to clash with the police "had committed a crime and that the group was acting as a unit." *Id.* at 1003-04. As a result, the court ruled that the police were entitled to qualified immunity with respect to those individuals who were arrested at the park, even though the decision by the police to funnel protesters to the park may have "caused the group to expand and enveloped people who were not present at the intersection." *Id.* at 1004-05. Nevertheless, key to the court's ruling was the fact that the arrests were not indiscriminate; rather, the police "attempted to discern who had been part of the unit at the intersection and released approximately 200 people, including seven of the plaintiffs, at the park." *Id.* at 1005. Although the plaintiffs contended that the group at the intersection was at most thirty to forty people, the court noted that the video showed at least fifty people clustered together, and another fifty nearby. Thus, the Court reasoned that arresting 160 at the park "was within the range of objectively reasonable police conduct" given the difficulty from the officers' vantage point of determining exactly how many people were present. *Id.*

*Carr* and *Bernini* provide insight into how the state can preserve public order and enforce the law in mass protest or riot situations, but they do not, and could not, alter the constitutional requirement of individualized probable cause as a prerequisite for lawful arrest. Rather, they stand for the unremarkable proposition that, where a group of individuals is acting in concert such that a reasonable police officer could conclude that every member of the group violated the law, that officer would be justified in arresting every member of the group.

As such, *Carr* and *Bernini* do not endorse a theory of collective or group

liability, nor do they reflect a departure from the rule of individualized probable cause. They merely offer a method of reaching individualized probable cause in a large, and potentially chaotic, group setting. Individualized probable cause remains the lodestar in these cases. An individual's participation in a lawbreaking group may, in appropriate circumstances, be strong circumstantial evidence of that individual's own illegal conduct, but, no matter the circumstances, an arresting officer must believe that every individual arrested personally violated the law. Nothing short of such a finding can justify arrest. The Fourth Amendment does not recognize guilt by association. *See Ybarra*, 444 U.S. at 91 ("[A] person's mere propinquity to others independently suspected of criminal activity does not . . . give rise to probable cause . . . ."); *United States v. Coreas*, 419 F.3d 151, 157 (2d Cir. 2005) ("Where an organization is not so 'wholly illegitimate' that membership itself necessarily implies criminal conduct, membership alone cannot provide probable cause.").

Dispersal orders play an important, though not essential, role in making such individualized determinations of probable cause. Although the Court declines to find that a dispersal order is an absolute prerequisite under the Fourth Amendment to finding that all arrestees in a mass arrest were violating the law,[6] it nevertheless recognizes that police efforts to sort lawbreakers from bystanders, and to advise the latter that they should leave, are highly probative of whether it would be reasonable to conclude that every person arrested violated the law. *Carr* and *Bernini* are

---

[6] The Court notes, without deciding, that a dispersal order may be required by the *First* Amendment in certain circumstances. Because of the limited nature of the motions and issues before the Court, such an issue has not been squarely presented at this time.

consistent with this conclusion; in both cases, police officers moved protestors off of the main street before making arrests. *See Bernini*, 665 F.3d at 1001-02; *Carr*, 587 F.3d at 404. Of course, efforts to disperse or sort the crowd both tend to ensure that innocent bystanders will not be included in the arrest and run the risk that some offenders will elude arrest. Nonetheless, that cost of the rule of individualized probable cause is clearly contemplated by the Fourth Amendment, as exemplified in cases like *Ybarra*.

With that clarification of the legal requirements, the Court now turns to the two arrest locations that are the subjects of the instant motions.

### B. Fulton Street Arrests

#### 1. Facts

On August 31, 2004, members of the War Resisters League planned a march at the World Trade Center to protest the wars in Iraq and Afghanistan. (Defs.' Fulton 56.1 ¶ 9.) The march was to proceed uptown, ending in a "die-in" either at Madison Square Garden, where the main RNC events were taking place, or wherever the march was stopped. (*Id.* ¶¶ 9-14.) Many, though not all, of the protesters intended to participate in the die-in. (Schiller Opp'n 56.1 ¶ 16.) The protesters did not obtain a permit for any portion of their planned demonstration. (*Id.* ¶ 17.) There is no allegation that there were particular threats of violence during this march, although the City was concerned about the possibility of violence and disorder during RNC demonstrations. (Defs.' Fulton 56.1 ¶¶ 6-8.)

At the outset of the march, while protesters were waiting on Church Street, NYPD Inspector Thomas Galati spoke with Ed Hedemann, one of the organizers of the

planned demonstration. (*Id.* ¶¶ 31-32.) Galati asked Hedemann to change the route of the march, and Hedemann declined. (*Id.* ¶¶ 35-38.) Galati then advised Hedemann that protesters could walk only one or two abreast so as to not block the sidewalk; if they blocked the sidewalk or violated traffic laws, they would be subject to arrest. (Decl. of Fred M. Weiler, dated Oct. 3, 2011, No. 04 Civ. 7922 (RJS) (JCF), Doc. No. 567 ("Weiler Decl."), Ex. A ("Defs.' Fulton Video"), ch. 1 at 0:30.) Galati appeared to be particularly concerned about a banner that the protesters wanted to carry and concluded that it should be carried sideways, parallel to the sidewalk facing Fulton Street, rather than facing forward, so that those carrying it would not be walking several abreast and blocking the sidewalk. (*Id.* at 0:25-0:35.) Galati announced that instruction via bullhorn and concluded by telling the protesters to have a "safe march." (*Id.* at 2:23-3:00.) The video does not show exactly how large the crowd was, so it is difficult to tell whether all marchers could have been expected to hear the announcement. (*Id.*) However, during Galati's announcement, protesters can be heard saying, "We can't hear you!" (*Id.* at 2:58; *see* Decl. of Michael L. Spiegel, dated Oct. 3, 2011, No. 05 Civ. 8453 (RJS) (JCF), Doc. No. 260 ("Spiegel Decl."), Ex. B ("Abdell Video"), Cook at 12:25-12:40.[7]) Police also walked through the crowd making similar announcements. (Defs.' Fulton 56.1 ¶¶ 77-78.) Although it is

undisputed that Galati believed that everyone congregated at the World Trade Center could hear the police warnings before the march, several individual Plaintiffs contend that they did not hear all of the warnings. (*E.g.*, Schiller Fulton Opp'n 56.1 ¶ 81; Schiller Fulton Add'l Facts in Opp'n to Defs.' 56.1 ¶ 5.)

The march began several moments after Galati's announcement, with marchers crossing Church Street onto the north side of Fulton Street and walking toward Broadway. (Defs.' Fulton 56.1 ¶ 94.) Police stood in the intersection of Church and Fulton, seemingly guiding the protesters and making announcements via bullhorn that there was no permit for the march and that marchers must comply with city and state laws or be subject to arrest. (Abdell Video, Cook at 13:00.) When some protesters appeared to cross against the light, voices seemingly belonging to protestors can be heard on the video advising marchers to get out of the street. (*Id.* at 13:40; *id.*, Hernandez at 27:30-27:40, 36:06-35:16.) Shortly thereafter, traffic can be seen moving freely up Church Street, as the first set of marchers continued east on Fulton, and the remainder paused at the intersection waiting for the light to change. (*Id.*, Cook at 13:57.)

The video indicates that the marchers, particularly those toward the front of the group, attempted to comply with Galati's instructions by walking two by two, although the columns were not perfectly aligned. (*E.g.*, *id.* at 13:10; *id.*, Hernandez at 23:20-23:30.) Individuals not participating in the march moved freely around the sidewalk, including journalists with cameras – indeed, the journalists and their equipment appear to be taking up more space than the marchers themselves. (*Id.*, Hernandez at 23:30, 36:25; Defs.' Fulton Video, ch. 2, at 1:30-1:40.) In any event, it does not appear that particular individuals

---

[7] This exhibit – Exhibit B of Michael L. Spiegel's declaration dated October 3, 2011 in Case No. 05 Civ. 8453 (RJS) (JCF) – consists of a DVD compiling various individual and organizations' videos of the events at issue. The exhibit will hereinafter be cited as "Abdell Video." The pincites will follow the format: "(Abdell Video, [chapter name] at [time])." For example, the fifteen-second period between minutes 12:30 and 12:45 of the chapter labeled "Cook" will be cited as "(Abdell Video, Cook at 12:30-12:45)."

who crossed Church Street against the light or who were walking more than two abreast were warned or arrested individually. (*See, e.g.*, Defs.' Fulton Video, ch. 5.)

Shortly after the march began, Deputy Chief Terrence Monahan appeared to conclude that the protesters who were carrying a banner were blocking the sidewalk. He stopped the front of the march and, unaided by a bullhorn, announced that if the protestors continued to block the street, they would be placed under arrest. (Defs.' Fulton Video, ch. 7 at 0:05-0:30.) Monahan's announcement is framed as a warning, telling protesters to comply *or* be subject to arrest. (*Id.* at 0:24-0:36.) Defendants contend that marchers were given an opportunity to disperse. (Defs.' Fulton 56.1 ¶ 128.) However, the video shows that the protesters were not given any additional opportunity to comply and continue the march, were blocked by a line of officers on bicycles, and were ultimately arrested. (Defs.' Fulton Video, ch. 7 at 0:25-0:45; *id.*, ch. 2 at 1:40-2:40.) For example, shortly after Monahan's announcement, a woman approached the line and told them that she wanted to leave; however, the video shows that she was given no response and was not allowed to leave the group, which was pinned against the wall of St. Paul's Cemetery on the north side of Fulton Street. (*Id.*, ch. 2 at 2:25.) Some individuals, who appear to be wearing press credentials, were permitted to leave (*id.* at 4:28), but seconds later an officer, possibly Monahan, can be heard saying that "everyone here will be placed under arrest right now." (*Id.* at 4:33.)

The video shows that there was little communication among the officers on Fulton Street, and it is not clear when the decision to make arrests was made. Monahan, who instructed the police to form a line, appears to have concluded that urgent action was necessary and that the marchers should be placed under arrest (*see* Schiller Fulton 56.1 ¶ 129). At the same time, Galati directed passersby on Fulton Street to get back into the march formation *or* be subject to arrest, apparently thinking that the march would be permitted to continue once the marchers made a narrower formation. (Abdell Video, Hernandez at 24:33). Consistent with this confusion, after Monahan's announcement, most of the marchers waited against the fence on Fulton Street in a manner that suggests that they believed they would resume marching. (Defs.' Fulton Video, ch. 2 at 3:30-4:30.) Meanwhile, officers at the back of the march closer to Church Street appeared not to be giving marchers any instructions at all. (Abdell Video, Hernandez at 32:05). As a large number of police flowed onto Fulton Street and toward Church Street, many stopped, apparently attempting to find out what was happening. (*Id.* at 37:00.)

Within minutes of Galati's initial announcement and the commencement of the march, protesters on the north side of Fulton Street were arrested, and were subsequently charged with (1) obstructing the sidewalk, in violation of N.Y. Penal Law § 240.20(5); (2) parading without a permit, in violation of N.Y.C. Admin. Code § 10-110; and (3) disobeying a lawful police order, in violation of N.Y. Penal Law § 240.20(6). Additionally, Defendants now argue that there was probable cause to arrest the marchers on Fulton Street for obstruction of governmental administration, in violation of Penal Law § 195.05. Defendants further contend that they released credentialed journalists (Defs.' Fulton 56.1 ¶ 151); however, it appears that not all individuals present for journalistic purposes were released. For example, Plaintiff Michael Schiller, who was present to film a documentary about the RNC protests, was

among those arrested.  (Schiller Fulton 56.1 ¶¶ 2, 14.)

The Court now turns to determining whether the NYPD had probable cause to arrest the protestors with respect to each charge.

## 2. Discussion

### a. Obstructing Traffic

Pursuant to § 240.20(5) of the New York Penal Law, a person is guilty of disorderly conduct when "[h]e obstructs vehicular or pedestrian traffic."  As the Second Circuit has noted, "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." *Parmley*, 465 F.3d at 59.

In the first place, it is questionable whether *any* of the Fulton Street protesters actually obstructed traffic within the meaning of § 240.20(5), as any blocking was temporary and pedestrians and cars were able to move with only a minimal amount of difficulty.  (Abdell Video, Cook at 13:57.)  Furthermore, as noted above, any blocking of the sidewalk that occurred was largely attributable to photographers and journalists covering the march, and not to the marchers themselves.

Even if some number of the marchers did obstruct vehicular or pedestrian traffic, it cannot be said that they all did so, and certainly not that they acted with a collective intent to violate the law.  To the contrary, the video shows marchers making concerted efforts to march two by two so as to leave room for pedestrians, stay out of the street, and comply with policy directions.  Thus, even accepting that the police reasonably believed that they arrested only *marchers* and not innocent bystanders, the police

could not have reasonably believed that all of the marchers on Fulton Street were acting as a unit to obstruct traffic.  Instead, Defendants' argument seems to be one of group liability: essentially, because the marchers collectively intended to march, their overall efforts to comply with police instructions were rendered irrelevant by the unlawful acts of a few members of the group.  Such a conclusion, though, is wholly inconsistent with the rule of individualized probable cause.  (*See supra* Section III.A.)  Put simply, no reasonable factfinder could observe the video and conclude that all of the marchers were blocking traffic.  The Court therefore finds that the police lacked probable cause to arrest the Fulton Street protesters for obstructing traffic.

### b. Parading Without a Permit

The New York City Administrative Code provides that a "procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefor has been obtained from the police commissioner."  N.Y.C. Admin. Code § 10-110(a).  Defendants argue that the statute covers sidewalks, or at least that Defendants would be entitled to qualified immunity on this question.  (Defs.' Fulton Br. at 23-24.)  Their sole case supporting this proposition is *Allen v. City of New York*, in which Judge Gorenstein declined to rule definitively as to whether the statute covers sidewalks but held that, in light of the ambiguity in the statute, a reasonable officer could conclude that it does.  No. 03 Civ. 2829 (KMW) (GWG), 2007 WL 24796, at *7 (S.D.N.Y. Jan. 3, 2007).

But even assuming that the statute covers activity on the sidewalks, the undisputed facts here indicate that the police *granted* permission to the protesters on Fulton Street to conduct their march on the sidewalk, only to have that permission

abruptly revoked by Monahan minutes later. (*See* Defs.' Fulton Video, ch. 2 at 2:30-2:40; *id.*, ch. 7 at 0:24-0:36.)   In this regard, the facts are remarkably similar to those of a recent Seventh Circuit case in which the plaintiffs were arrested *en masse* for a street protest in Chicago.  In that case, the Seventh Circuit ruled that, although a permit would have generally been required for such a demonstration, the police had given verbal permission and thus were required to "give notice of revocation of permission to demonstrate before they can begin arresting demonstrators." *Vodak v. City of Chicago*, 639 F.3d 738, 746 (7th Cir. 2011).  The court affirmed that "the Fourth Amendment does not permit the police to say to a person go ahead and march and then, five minutes later, having revoked the permission for the march without notice to anyone, arrest the person for having marched without police permission."  *Id.* at 746-47.  The Seventh Circuit's logic applies with equal force here.  The undisputed facts, particularly the video, confirm that the marchers on Fulton Street were attempting to comply with police instructions and that the revocation of consent for the march came suddenly and without any realistic opportunity to disperse or correct the problems with the march.  Accordingly, the Court finds that the police lacked probable cause to arrest all marchers on Fulton Street for parading without a permit.

### c.  Defying a Police Order

"A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof[,] [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Penal Law § 240.20(6).  Thus, whether the police had probable cause to arrest the marchers for defying a police order turns on two factors.

The first is whether, and to what extent, the police communicated their orders to the entire crowd.  *See People v. Carcel*, 3 N.Y.2d 327, 333 (1957) ("[T]he gravamen of the offense . . . is the refusal to desist from . . . conduct after being ordered to by the police."); *see also Vodak*, 639 F.3d at 745 ("[B]efore the police could start arresting peaceable demonstrators for defying their orders they had to communicate the orders to the demonstrators.").  The second is whether the demonstrators were given an opportunity to comply with those orders – that is, whether they indeed refused to do so.

Based on the video and other evidence of record, Monahan's single dispersal order was not amplified and could not have been reasonably expected to be heard by all of the marchers.  (*See, e.g.*, Defs.' Fulton video, ch. 7 at 0:05-0:36.)  The marchers at the back of the line were clearly oblivious to what was going on ahead of them and continued to cross Church Street, swelling the ranks of marchers on the sidewalk.  There is simply no evidence that the marchers who were more than a few feet from Monahan defied his order.

Moreover, even if Monahan's dispersal order had been sufficiently loud to be heard by all, the marchers had no opportunity to comply with it.  Monahan abruptly stopped the march within minutes of its beginning and ordered the marchers to move to the north side of Fulton Street against the St. Paul Cemetery fence.  At that point, the police began to form a line that effectively corralled the marchers on the sidewalk, leaving them nowhere to go even if they wanted to leave.  Indeed, several marchers (and perhaps bystanders) who attempted to leave were ordered back to the sidewalk, making it clear that they were not free to leave and were effectively arrested.  (*Id.*, ch. 2 at 2:20-2:32.)  Because the marchers had

no opportunity to comply with Monahan's so-called dispersal order, the Court finds that there was no probable cause to arrest even protesters at the *front* of the march who might have been able to hear the order.

### d. Obstruction of Governmental Administration

The Penal Law provides that "[a] person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Penal Law § 195.05. Defendants argue that Plaintiffs violated the statute by refusing to comply with police orders to walk two abreast, obey traffic lights, not block pedestrian traffic, and disperse. (Defs.' Fulton Br. 26.) For the reasons stated above, the police could not have reasonably concluded that all of the marchers on Fulton Street were acting as a unit to commit any such violations. Thus, there was no probable cause to arrest protestors for violating this statute.

### 3. Qualified Immunity

Defendants alternatively contend that the individual Defendants are entitled to qualified immunity. A police officer is entitled to qualified immunity for a false arrest claim if there was "arguable probable cause" for the arrest. *Goldberg v. Town of Glastonbury*, 453 F. App'x 40, 42 (2d Cir. 2011) (quoting *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)). Arguable probable cause exists if "'(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on

whether the probable cause test was met.'" *Id.* (quoting *Amore*, 624 F.3d at 536).

Based on the undisputed facts, and particularly the video of the Fulton Street march and arrests, the Court finds that there was not even arguable probable cause to make those arrests. At most, reasonable officers could disagree as to whether *some* of the marchers were obstructing traffic; however, no reasonably competent officer could have believed that *all* of the marchers on Fulton Street had violated the law and were properly subject to arrest. As noted above, it was clearly established by 2004 that an officer must have individualized probable cause to arrest an individual and that mere proximity to illegal conduct does not establish probable cause with respect to an individual. *See, e.g.*, *Ybarra*, 444 U.S. at 91; *Rogers v. City of Amsterdam*, 303 F.3d 155, 160 (2d Cir. 2002) (reversing district court's grant of qualified immunity on false arrest claim where "[t]he information available to [the officer] indicated that [the plaintiff] was nothing more than an interested bystander," even though the officer arguably had probable cause to arrest others).

\*       \*       \*

For the foregoing reasons, the Court grants Plaintiffs' motions for summary judgment with respect to their false arrest claims at Fulton Street on August 31, 2004, and denies Defendants' motion.

### C. East 16th Street Arrests

### 1. Facts

On August 31, 2004, shortly before 7:00 p.m., a large number of individuals, including two marching bands, gathered in Union Square Park in Manhattan to protest the RNC. (Defs.' East 16 56.1 ¶¶ 16-17.)

Shortly thereafter, a group, including one of the marching bands, left the park and began marching north up Union Square East on both the street and the sidewalk, blocking traffic and chanting "our street." (Decl. of Gerald S. Smith, dated Oct. 3, 2011, No. 04 Civ. 7921, Doc. No. 266 ("Smith Decl."), Ex. D ("Defs.' East 16 Video"), ch. 2 at 3:15-3:45.[8]) The marchers did not have a permit to parade (Defs.' East 16 56.1 ¶ 19), nor is there any suggestion that the police expressly consented at any time to the protesters marching either on the street or on the sidewalk. As the group proceeded north on Union Square East, the police formed a line to prevent the marchers from proceeding further up the block, prompting the marchers to turn right onto East 16th Street. (Defs.' East 16 56.1 ¶ 32; Defs.' East 16 Video, ch. 2 at 5:50-6:00.)

As the group, which now numbered in the hundreds, entered East 16th Street, NYPD Deputy Inspector James Essig gave unamplified orders for the marchers to stop but "knew his order was likely inaudible." (Dinler East 16 Add'l Facts in Opp'n to Defs.' 56.1 ("Dinler Add'l Facts") ¶ 72.) The police formed lines on both the east and west ends of the stretch of East 16th Street between Union Square East and Irving Place. (Decl. of Jonathan C. Moore, dated Oct. 3, 2011, No. 04 Civ. 9216, Doc. No. 451 ("Moore Decl."), Ex. A ("MacNamara TARU Video"), ch. 3 at 0:36-0:50; Defs.' East 16 56.1 ¶ 45.) Inspector Gerald Dieckmann gave an unamplified order directing people to return to the park, but did not know whether anyone heard him. (Defs.' East 16 56.1 ¶ 64.)

On East 16th Street, most of the marchers remained in the middle of the street, blocking the roadway entirely, and spilling over into the sidewalk as well. (*E.g.*, Defs.' East 16 Video, ch. 3 at 2:00, ch. 4 at 0:01-1:20, ch. 5 at 0:01-2:30.) The group was playing music, chanting, and dancing, and some people also sat in the street. (*Id.*, ch. 5 at 0:01-2:30.) Several people, many of whom are Plaintiffs, were also present on the sidewalk of East 16th Street between Union Square East and Irving Place. Some were part of the protest, but many assert that they were present on the sidewalk for other purposes – as legal observers, as curious bystanders, or for wholly unrelated reasons, such as walking to or from work. (*E.g.*, Dinler East 16 56.1 ¶¶ 2-5, 37-38; MacNamara East 16 56.1 ¶¶ 2-6.)

By the time the crowd reached the eastern end of the block at Irving Place, there was a line of police motorcycles blocking the way. (Defs.' East 16 Video, ch. 4 at 1:30.) For some period of time, the line of police across East 16th Street at Irving Place extended only curb to curb, leaving the sidewalks open for people to leave. (*Id.*, ch. 5 at 5:50-6:00.) However, the *Dinler* Plaintiffs allege that at some point, as the march proceeded down the street, the line was extended building to building. (Dinler East 16 56.1 ¶ 21; Dinler Opp'n 56.1 ¶ 42)

By about 7:02 p.m., the NYPD also formed a line at the western end of East 16th Street at Union Square East, stretching across the sidewalk and preventing new people from entering the street. Several dozen people, however, appear to have been allowed to leave the street. (Defs.' East 16 56.1 ¶¶ 44-45; Defs.' East 16 Video, ch. 6 at 2:00-5:40.) Essig testified that he saw "less than [forty]" people leave East 16th Street; Dieckmann believed that several people had

---

[8] Many of these videos do not have time stamps, and the times provided herein reflect the time in the video compilation as a whole rather than that reflected in a time stamp in the video itself.

left but did not observe them leaving, and was only sure that three or four people had left. (Defs.' East 16 56.1 ¶ 48.)

Around 7:05 p.m., some members of the crowd who had been heading east on East 16th Street turned back and began traveling west toward Union Square East. (Defs.' East 16 Video, ch. 5 at 1:10-1:20.) The crowd was met midway down the block by a line of police in the street and was largely moved off of the street and directed onto the sidewalk, though people still remained in the street for several more minutes. (*Id.*, ch. 5 at 3:00, 12:00-14:00, 15:55; MacNamara TARU Video, ch. 1 at 4:55-5:30.)

Although the video clearly shows that people were permitted to leave for some period of time, Plaintiffs Dinler, Maurer, and Waters allege that they looked for opportunities to leave at both ends of East 16th Street to no avail. (Dinler East 16 56.1 ¶¶ 5-8, 21-23, 39-41.) Dinler further alleges that she expressly asked officers both at Union Square East and Irving Place for permission to leave but was not permitted to do so. (*Id.* ¶¶ 6, 8.) Consistent with these allegations, Lieutenant Mark Keegan stated that when the crowd began to turn toward Union Square East, he told his officers not to let anyone leave. (Dinler East 16 Opp'n 56.1 ¶ 46.)

After deciding that the protesters on East 16th Street should be arrested – the parties dispute precisely when this decision was made (*compare* Defs.' East 16 56.1 ¶¶ 54-55, *with* MacNamara East 16 Opp'n 56.1 ¶¶ 54-55) – Essig sent two officers through the crowd to make unamplified announcements advising innocent bystanders to leave the area, but he did not provide the officers with any instructions as to what to say or how to identify individuals who were not part of the protest. (Dinler Add'l Facts ¶¶ 78-81.) For example, one officer can be seen on video

telling the cameraman that he would not be stopped if he "break[s] off and go[es] back"; however, the cameraman responds that he had just been pepper-sprayed on the sidewalk. (Defs.' East 16 Video, ch. 6, at 6:00-6:15.) The cameraman ultimately exited at Irving Place several minutes later. (*Id.* at 8:15.) The officers spent no more than five minutes giving these instructions, and Essig did not follow up with the officers before ordering that the people between the police lines be arrested. (Dinler Add'l Facts ¶¶ 81-82.)

The police began making arrests of individuals still in the street at about 7:12 p.m. At this point, chanting and musical instruments can be heard on the block, and onlookers remained on the sidewalk. (MacNamara TARU Video, ch. 1 at 5:55-12:00.) By about 7:28 p.m., police began handcuffing people on the sidewalk as well. (*Id.* at 17:20.)

Several other Plaintiffs allege that they never heard a dispersal order or instructions regarding how to leave East 16th Street, and it appears to be undisputed that there was no amplified dispersal order, although some officers gave unamplified dispersal orders to the noisy crowd. (Dinler Add'l Facts ¶ 72; MacNamara East 16 Reply 56.1 ¶ 351.) Eventually, the police moved everyone out of the street and onto the north sidewalk of East 16th Street. (Defs.' East 16 56.1 ¶ 52.) Ultimately, Essig and Dieckmann decided to place under arrest everyone remaining on the blocked-off stretch of East 16th Street. (*Id.* ¶ 54.) However, it is not clear how the timing of this decision fits in with when police were allowing people to leave. Indeed, the parties dispute the length of time that the police let anyone leave East 16th Street after the march first entered the street: Defendants contend that about ten to fifteen minutes passed, while Plaintiffs argue that

14

by the time they reached the line of officers, the block was already sealed.

Defendants now argue that there was probable cause to arrest the Plaintiffs for (1) obstructing the sidewalk, in violation of N.Y. Penal Law § 240.20(5); and (2) parading without a permit, in violation of N.Y.C. Admin. Code § 10-110. The Court now proceeds to address each argument in turn.

### 2.  Discussion

In sharp contrast to the Fulton Street march, it is clear that, from the time the marchers left Union Square Park, a large number of individuals were openly and consciously violating the law. Dozens, possibly even hundreds of people were blocking traffic by marching in the middle of Union Square East without a permit. When the group turned onto East 16th Street, it rendered that street entirely impassable.

Some Plaintiffs contend that the NYPD played a part in funneling protestors onto East 16th Street. (Adams East 16 Opp'n 56.1 ¶ 21.) The undisputed facts and video support the inference that the police did intend to divert the crowd onto East 16th Street. (*E.g.*, MacNamara TARU Video, ch. 3 at 0:22-0:31.) Still, setting aside for a moment those bystanders who were confused as to the nature of the march, no serious argument can be made that the participants reasonably believed that the march was permitted or consented to merely because the police attempted to divert a large and raucous crowd away from the street that becomes Park Avenue and onto a less heavily trafficked road. Thus, the Court has little trouble concluding that *some* people – in fact, a large number of people – present on the street at the time of the East 16th Street arrests were actively engaged in

obstructing the sidewalk in violation of N.Y. Penal Law § 240.20(5) and in parading without a permit in violation of N.Y.C. Admin. Code § 10-110. At a minimum, the police could reasonably have concluded that this was the case.

However, at the time the protesters were still in the street, it is clear from the undisputed facts – particularly the video – that bystanders were standing on the sidewalk and observing, but not participating in, the unlawful march on the street. (*E.g.*, Defs.' East 16 Video, ch. 4 at 2:20.) It cannot be seriously contended that merely *watching* the march or covering the march as a journalist either constitutes blocking traffic within the meaning of § 240.20(5) or makes the observer part of a "unit" that is parading unlawfully. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) ("[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this 'right to remove from one place to another according to inclination' as 'an attribute of personal liberty' protected by the Constitution."). And it is clear from the undisputed facts that some individuals ultimately arrested on East 16th Street were not involved in the parade and did not block vehicular traffic.

The essential question for this location, then, is whether, at the time of the arrests, the police reasonably believed that *everyone* arrested was participating in the unlawful conduct. Put another way, the question is whether, at the time the arrests were made, police reasonably believed that bystanders had had sufficient notice and opportunity to leave the area and that only lawbreakers remained. (*See supra* Section III.A (rejecting group probable cause theory in favor of the rule of individualized probable cause).) It is clear that the police allowed

15

*some* people to exit at both ends of the street, but there remain significant disputes of fact as to the nature of the officers' efforts to cull the lawbreakers from the larger group and as to how much time elapsed before the police *prevented* people from leaving the street. Of course, the mere fact that Dinler was told that she could not leave does not alone prove that the police lacked probable cause to arrest the people on East 16th Street. However, Dinler's allegations, along with those of other Plaintiffs, raise serious questions regarding whether the officers' efforts to (1) inform people that they must leave and then (2) allow people enough time to comply with the dispersal order were sufficient to make the subsequent arrests reasonable. When a mass arrest occurs in a setting where shortly before there was a clear mix of lawbreakers and bystanders, separating the bystanders requires more than merely allowing people to leave should it occur to them that they *might* be arrested if they remain. Instead, the reasonableness of the East 16th Street arrests turns on whether the police either sufficiently sorted the arrestees or affirmatively conveyed to all bystanders that they should, and could, leave in order to avoid arrest. *Cf. Parmley*, 465 F.3d at 60 (holding that police could not arrest protestors for violating a state traffic statute unless they could "identify those individuals who had entered the . . . roadway"); *Barham*, 434 F.3d at 576 (holding that, in confronting a volatile demonstration, the police chief could not "deal with the crowd as a unit unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order" (internal quotation marks omitted)). Neither the statements of undisputed facts submitted by the parties nor the videos provide a sufficient answer to that question.

Accordingly, the Court finds that there remain questions of fact as to whether police made sufficient efforts to clear innocent bystanders from the street before placing those that remained on East 16th Street under arrest. Therefore, the Court cannot conclude whether the police had probable cause to arrest all the Plaintiffs.

### 3. Qualified Immunity

As stated above with respect to the Fulton Street arrests, the law of individualized probable cause was clearly established well before August 31, 2004. Accordingly, the arresting officers would be entitled to qualified immunity only if they reasonably could have believed that each of the individuals arrested on East 16th Street was involved in unlawful conduct. As noted above, this inquiry turns on the officers' efforts to release innocent bystanders and to make sure that they arrested only those who participated in the unlawful march. Because there are questions of fact concerning whether the police made sufficient efforts to clear innocent bystanders from East 16th Street before arresting those who remained, the Court must deny Defendants' motion for summary judgment on the basis of qualified immunity.

\*   \*   \*

For the foregoing reasons, the Court denies the parties' cross-motions for summary judgment on Plaintiffs' false arrests claims for the arrests at East 16th Street on August 31, 2004.

### IV. THE FINGERPRINTING AND NO-SUMMONS POLICIES

#### A. Facts

The City expected up to half-a-million visitors during the RNC and believed that demonstrations might prove "highly charged." (Defs.' Policies 56.1 ¶ 10.) To

prepare for this influx, the NYPD Intelligence Division gathered publicly available information regarding potential threats to the City during the RNC and concluded that the City faced a "tripartite threat" of international terrorism, anarchist violence, and widespread civil disobedience.[9] (*Id.* ¶¶ 46-49.) The City also obtained intelligence through publicly available sources that certain groups and individuals were planning activities to "shut down" the RNC and the City. (*Id.* ¶ 98.) According to the NYPD, the intelligence "suggested that many individuals who were intent on committing unlawful conduct at RNC-related events and demonstrations were being directed not to bring any identification or to present false identification to law enforcement." (*Id.* ¶¶ 124-135.) In response to the perceived threats of mass disorder, the City adopted the "No-Summons Policy," which suspended the City's ordinary policy of issuing summonses for violations,[10] and the "Fingerprinting Policy," which required fingerprinting of all persons arrested for RNC-related criminal activity (collectively, the "Policies"). Both represented a departure from ordinary practices, under which an officer who had probable cause to believe that an individual had committed a violation would merely issue a summons if the individual presented valid identification and had no outstanding warrants. (Schiller Policies Opp'n 56.1 Add'l Facts in Opp'n to Defs.' 56.1 ("Schiller Policies Add'l Facts") ¶ 1.)

The Policies applied to anyone who was "engaged in criminal conduct that was related to the RNC." (*Id.* ¶ 151.) Activity was deemed related to the RNC if it "revolved around the RNC or was connected to the RNC." (*Id.* ¶ 167.) Defendants assert that whether unlawful conduct was deemed "RNC-related" turned on whether it was the type of conduct that the intelligence suggested was a threat to the City or the RNC. (*Id.* ¶ 170.) Counsel further clarified at oral argument that the Policies "didn't apply to things that would have been going on anyway, absent the RNC"; for example, participants in an unauthorized road race that blocked traffic would not be subject to the policies. (Transcript of May 31, 2012 Oral Argument, No. 04 Civ. 7921, Doc. No. 310 ("Tr."), at 79:7-21.) Additionally, it is undisputed that the Policies were not aimed solely at large groups, as at least two individuals who were protesting alone were arrested subject to the Policies: (1) Georgianna Page was arrested in front of a Hummer dealership at 55th Street and 11th Avenue, where she was protesting the vehicles and their connection with the war in Iraq (Dinler Policies Opp'n 56.1 at 5); and (2) Nikolas Sikelianos was arrested while riding his bicycle on 27th Street between Madison and Park Avenues dressed as Uncle Sam (Decl. of Jeffrey Rothman, dated Nov. 3, 2011, No. 05 Civ. 767, Doc. No. 196 ("Rothman Decl."), Ex. 15 at 435:23-441:23). The same officer arrested both individuals and stated that he believed that they were "present at the RNC in order to make some sort of statement." (Rothman Decl., Ex. 15 at 435:23-441:23.)

The City asserts that it concluded that fingerprinting would allow law enforcement to ascertain whether a detained individual posed a particular threat. (Defs.' Policies 56.1 ¶¶ 201-209.) Moreover, in light of intelligence suggesting widespread protests aimed at interfering with RNC activities as

---

[9]  The City also gathered information from confidential sources; however, Defendants do not rely on any confidential information in these cases. (Defs.' Policies 56.1 ¶ 24 & n.4.)

[10]  The term "violation" is used here to denote a category of offenses distinct from misdemeanors and felonies and for which "a term of imprisonment in excess of fifteen days cannot be imposed." N.Y. Penal Law § 10.00(3).

well as City traffic, the City concluded that custodial arrest was necessary to prevent "escalating disorder." (*Id.* ¶ 187.) More generally, Deputy Commissioner Cohen, after analyzing other large-scale political protests, such as the 1999 World Trade Organization ("WTO") protests in Seattle, concluded that "it only takes a small number of extremist elements to trigger spiraling disorder, massive property damage, and violence at large-scale demonstrations." (*Id.* ¶ 38.) At the same time, it is undisputed that the City granted permits for several large demonstrations, allowed other unpermitted marches, and established a demonstration area near Madison Square Garden. (Defs.' Policies 56.1 ¶¶ 251, *et seq.*)

The Parties offer sharply differing accounts of the decisionmaking process that resulted in the adoption of the No-Summons and Fingerprinting Policies. Plaintiffs allege that the decision to implement the policy was made in April 2004 and was unrelated to any research into particular RNC-related threats. (Schiller Policies Add'l Facts ¶ 23.) Specifically, based on the timeline provided by Defendants, Plaintiffs note that Cohen was not even involved in the decision. (*Id.* ¶ 25.) Plaintiffs further note that they were not allowed to depose Commissioner Raymond Kelly, *see Schiller v. City of New York*, No. 04 Civ. 7922 (KMK) (JCF), 2006 WL 2708464 (S.D.N.Y. Sept. 20, 2006), and that the person whom they did depose, Department Chief Joseph Esposito, had little memory of the meeting in which the decision was made to adopt the Policies. (Schiller Policies Opp'n 56.1 ¶¶ 30-41.) By contrast, Defendants argue that the process was "evolving" based on intelligence but that the final decision was not made until August 2004, and that in any event there was "ample support for the Policies" as of April 2004. (Defs.' Policies 56.1 ¶¶ 155-160.)

## B.  Discussion

### 1.  Motion to Strike

Defendants' motion for summary judgment on the No-Summons and Fingerprinting Policies relies heavily on Cohen's testimony regarding the reasons underlying those policies. Cohen discussed both his personal knowledge of possible terrorist threats to the City during the RNC and his research into similar incidents elsewhere, such as the 1999 WTO protest in Seattle. Cohen asserts that both informed his conclusions about how seemingly peaceful protests can explode into chaos and violence. (*Id.* ¶¶ 32-38.) Seeking to prevent consideration of Cohen's testimony, Plaintiffs argue that Cohen was improperly used as an expert witness even though Defendants disclosed Cohen only as a lay witness.

The line between expert and lay testimony is sometimes subtle. In *Bank of China v. NBM LLC*, the Second Circuit ruled that the district court properly admitted testimony by a bank employee about his investigation of the defendant's activities "so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking." 359 F.3d 171, 181 (2d Cir. 2004); *see also United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) ("A witness's specialized knowledge . . . does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." (internal quotation marks omitted)). However, the court ruled that his explanations of typical international banking transactions and definitions of banking terms were expert testimony and thus the proponent of this testimony was obligated to

satisfy the requirements of Rule 702 of the Federal Rules of Evidence.  *Id.* at 182.

Having carefully considered the record and case law, the Court finds that Cohen's testimony about his investigation into particular threats against the City during the RNC is properly considered as lay testimony, as it covers only his findings and conclusions relating to his own investigation.  Although Cohen's general conclusions and assertions about the risks of chaos and disorder resulting from widespread civil disobedience look somewhat more like expert testimony, it is undisputed that he researched, analyzed, and considered these events in connection with his particular task – namely, determining potential terrorist and other threats to the City during the RNC.  In contrast to the testimony in *Bank of China*, Cohen's testimony is not based only on general experience in the area.  *See id.* at 181.  Moreover, even Plaintiffs do not contend that they were unaware of Cohen's role in analyzing a variety of sources of information to determine potential threats to the City during the RNC.

Accordingly, the Court finds that Cohen was properly disclosed as a fact witness, and his testimony can be considered as such.  The Court therefore denies Plaintiffs' motion to strike.

### 2.   State Law Relating to the Fingerprinting Policy

#### a.   Authority to Fingerprint Under N.Y. Criminal Procedure Law § 160.10(1)

Plaintiffs' motion for summary judgment on the Fingerprinting Policy focuses on the state-law aspect of the claim.  New York criminal procedure law provides that arrestees for felonies or misdemeanors *must* be fingerprinted.  *See* N.Y. Crim. Proc. Law

§ 160.10(1).  The statute further provides in relevant part that a police officer *may* take fingerprints in other cases if the officer "(a) [i]s unable to ascertain such person's identity; or (b) [r]easonably suspects that the identification given by such person is not accurate."  *Id.* § 160.10(2).  Plaintiffs argue that their fingerprinting was unlawful because they were arrested on violations, not misdemeanors or felonies, and had valid identification that the police had no reason to believe was inaccurate.  (Schiller Policies Br. at 20-21.)

Defendants appear to concede that the statute does not permit fingerprinting for violations as a general matter.  (*See* Defs.' Policies Br. at 53.)  *See People v. White*, 56 N.Y.2d 110, 112 n.1 (1982) (explaining that downgrading a charge to a violation means that "one charged under this section is not to be fingerprinted").   Moreover, it is undisputed that the majority of Plaintiffs in fact possessed valid identification.  (*See, e.g.*, Dinler Policies Response 56.1 ¶¶ 16, 37, 39, 57.)  Thus, the only question is whether Defendants had reasonable grounds to suspect that Plaintiffs' means of identification were inaccurate.  The record reflects that they did not.

Although Defendants maintain that the intelligence they gathered justified suspicion of the authenticity of protestors' means of identification (Defs.' Policies 56.1 ¶¶ 124-135), the intelligence actually indicates only that certain groups of extremists or anarchists were instructed to carry *no* identification (Schiller Policies Opp'n 56.1 ¶ 134; Defs.' Policies Reply 56.1 ¶ 124).  Contrary to Defendants' assertions that protestors were directed to bring false identification, there does not seem to be any suggestion in the intelligence provided by Defendants that RNC protesters were particularly likely, or were instructed, to carry *false* identification.   Rather, the

intelligence cited by Defendants in their original Rule 56.1 statement merely establishes that individuals may have been creating false credentials to gain access to RNC-related events. (Defs.' Policies Reply 56.1 ¶ 124; Schiller Policies Opp'n 56.1 ¶ 134.)

Defendants also cite to additional materials that appear to support only the conclusion that some protestors planned to bring *no* identification and to supply false names to hospitals if they needed medical care. (Defs.' Policies Reply 56.1 ¶ 134; Affidavit of Daniel Mullkoff, dated Dec. 21, 2011, No. 04 Civ. 7922, Doc. No. 622-5, Ex. X at 6.) And while there was a question as to the validity of one Plaintiff's identification, there is no assertion that any Plaintiff carried false identification as a tactic to confuse the police or evade responsibility. Finally, as for Defendants' argument that counterfeit identifications can be easily obtained (Defs.' Policies 56.1 ¶¶ 136-145), that proposition logically would apply to any lawbreaker. Taken to its logical conclusion, such an argument would render the statutory requirement of reasonable suspicion a nullity, with the result that any arrestee could be fingerprinted for any reason, or no reason, notwithstanding the clear language of the statute.

Because Defendants have not presented any grounds for reasonable suspicion that the protestors' identification documents were or would be inaccurate, the Court has little difficulty concluding that the Fingerprinting Policy violated Section 160.10(1). That provision's plain language does not permit the state to suspend ordinary enforcement of fingerprinting laws at whatever time, or with regard to whatever group, the state sees fit. To the contrary, Section 160.10(1), on its face, provides for an *individualized* determination as to the

likelihood that the identification given was inaccurate. Defendants concede that they did not engage in such an individualized process. Accordingly, the Court finds that the Fingerprinting Policy adopted during the RNC violated Section 160.10.

b.   Private Right of Action

Defendants argue that, even if the police were not authorized to fingerprint the RNC arrestees, there is no private right of action for wrongful fingerprinting.[11]   Under New York law, where the statute neither expressly creates nor forbids a private right of action, one may be implied based on the following factors: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." *Uhr v. E. Greenbush Cent. Sch. Dist.*, 94 N.Y.2d 32, 38 (1999) (internal quotation marks omitted).

Whether there is a private right of action for wrongful fingerprinting under Section 160.10 appears to be a matter of first impression. The only New York case involving wrongful fingerprinting arose under an older, since-repealed statute, N.Y. Crim. Proc. L. § 940. That statute gave police discretion to fingerprint persons arrested for certain, specified crimes. In *Fidler v. Murphy*, a New York Supreme Court affirmed a jury verdict and award of damages for wrongful fingerprinting where the plaintiffs had been arrested for a crime that was not among those the statute

---

[11] To the extent that Plaintiffs raise a claim pursuant to 42 U.S.C. § 1983 based on violation of Section 160.10, that claim should fail, as § 1983 does not provide any remedy for violations of state law. *Young v. Cnty. of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998).

enumerated. *See* 203 Misc. 51, 52-53 (N.Y. Sup. Ct. 1952). *Fidler*'s holding gives some support to the proposition that the general public, including people like Plaintiffs, is the intended beneficiary of fingerprinting statutes.

A comparison of Section 160.10 with prior fingerprinting statutes, such as N.Y. Crim. Proc. L. § 940, reinforces that view. Section 160.10 reduced police discretion over fingerprinting by making the procedure mandatory in all misdemeanor and felony arrests; police retained discretion only over violations, and even then, the statute provided criteria to guide officers' choices. A private right of action would promote the Legislature's apparent purpose in revising the statute by incentivizing police to fingerprint only where expressly authorized to do so.

A private right of action also is consistent with the apparent legislative scheme governing when fingerprinting is permitted for violations. In permitting fingerprinting only when there are reasonable grounds to doubt the accuracy of an arrestee's identification, Section 160.10(2) appears designed both to verify that those arrested for violations are not wanted for more serious crimes and to ensure that those arrested for violations receive greater consideration for their privacy than those arrested for more serious crimes. A private right of action promotes Section 160.10's balance between safety and privacy. Furthermore, a private right of action does not interfere with any existing alternative civil remedy for wrongful fingerprinting. *See Sheehy v. Big Flats Cmty. Day, Inc.*, 73 N.Y.2d 629, 636 (1979).

Accordingly, the Court finds that there is a private right of action for wrongful fingerprinting under N.Y. Crim. Proc. L. § 160.10(1), and thus grants Plaintiffs'

motions, and denies Defendants' motions, for summary judgment on the state law fingerprinting claims.

### 3. Fourth Amendment

Defendants move for summary judgment on Plaintiffs' Fourth Amendment claims relating to the Policies on the grounds that there is no constitutional right to a summons and that it is not unconstitutional to fingerprint individuals incident to arrest. (Defs.' Policies Br. 5-9.) By contrast, the *MacNamara* Plaintiffs contend that the Policies were objectively unreasonable under the Fourth Amendment because, *inter alia*, they were not necessary to address the City's goals relating to maintaining order. (MacNamara Policies Opp'n 9-10.)[12]

The Supreme Court has made clear that an individual may be placed under custodial arrest for "even a very minor criminal offense." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also Bryant v. City of New York*, 404 F.3d 128, 138-39 (2d Cir. 2005) (holding that the City's decision to keep arrested protestors in custody until they could be arraigned, rather than issue them desk appearance tickets, was not objectively unreasonable). Plaintiffs' attempt to distinguish these cases on the grounds that they addressed discretionary decisions by officers, whereas here there was a citywide policy, is thoroughly unconvincing. Indeed, the Supreme Court in *Atwater* specifically rejected the petitioner's invitation to examine her arrest in light of its specific circumstances, observing that "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government

---

[12] Plaintiffs also argue that the Policies were unreasonable because they targeted expressive conduct. (*Id.* at 11.) This argument coalesces with their First Amendment claims, which are addressed *infra* Section IV.B.4.

need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Atwater*, 532 U.S. at 347. Thus, in upholding the constitutionality of the arrest in *Atwater*, the Supreme Court did not narrowly approve an officer's discretionary actions in response to specific circumstances. Rather, it upheld the general principle that arrests even for minor criminal offenses are constitutional. The implications of *Atwater* are fatal to Plaintiffs' Fourth Amendment arguments, for if the arrests are constitutionally valid, it follows that fingerprinting the arrestees is too. *See United States v. Kelly*, 55 F.2d 67, 70 (1932) (holding that fingerprinting incident to arrest for either a felony or a misdemeanor infringes no constitutional right); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991) (recognizing fingerprinting as one of the "administrative steps incident to arrest"); *Gerstein v. Pugh*, 420 U.S. 103, 113-17 (1975) (holding that "a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest"); *United States v. Amerson*, 483 F.3d 73, 86 n.14 (2d Cir. 2007) (citing *Kelly* approvingly and applying its reasoning to DNA identification).

Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' claim that the Policies violated the Fourth Amendment.[13]

---

[13] Plaintiffs also contend that both Policies subjected them to unreasonably long detention, particularly because they were detained at a place where no fingerprinting equipment was available. The Court declines to rule on this claim at this time. To the extent Plaintiffs argue that the Policies were designed or carried out to make Plaintiffs' conditions of confinement lengthier and more onerous, the Court

### 4. First Amendment

Defendants also seek summary judgment that the Policies did not violate Plaintiffs' First Amendment rights. Defendants contend that the Policies in no way burdened those rights because they aimed solely at unlawful conduct (Defs.' Policies Br. at 10-11); in the alternative, Defendants argue that even if the Policies burdened First Amendment rights, they were content neutral and thus warrant intermediate scrutiny, (*id.* at 13.) Under intermediate scrutiny, restrictions on protected speech or conduct will be constitutional if they are "justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Defendants argue that the Policies were adequately tailored to serve the important government interests of maintaining order and preventing violence and terrorism, and that they did not restrict more speech than necessary.

### a. No-Summons Policy

Neither of Defendants' theories is persuasive with respect to the No-Summons Policy. The No-Summons Policy did not merely target unlawful conduct, as Defendants contend. Rather, it aimed at unlawful conduct connected to the RNC. (Defs.' Policies 56.1 ¶ 151.) Thus, if one individual jaywalked as part of an antiwar march, and another individual jaywalked simply to save time, the former faced arrest while the latter risked only a summons, and

---

finds that that issue has not been fully presented and briefed and is more properly considered with respect to Plaintiffs' claims relating to the conditions of their confinement, which are not before the Court at this time.

the only factor accounting for that difference was the former's association with expressive activity directed at the RNC. Not even all protestors were equal under the No-Summons Policy. Only viewpoints within the RNC umbrella exposed protestors to arrest; those protesting issues unrelated to the RNC did not share that risk. (Tr. at 79:22-80:2.)

Thus, it is inaccurate to say that the No-Summons Policy targeted only unlawful conduct. Mere unlawful conduct, after all, did not trigger the Policy. What triggered the Policy was unlawful conduct *plus* an intent to express some view regarding the RNC. That combination of triggers belies Defendants' claim that the No-Summons Policy did not burden First Amendment rights and was content-neutral. The No-Summons Policy did not simply burden expression incidentally, as is permitted under the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011). Rather, it burdened First Amendment rights directly by requiring harsher treatment for conduct associated with certain political expression. *See id.* ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

Defendants cannot avoid application of First Amendment protections by claiming that this burden is acceptable simply because people could avoid arrest by not committing violations. (Defs.' Policies Br. 11.) Minor violations, such as jaywalking, are commonplace, particularly during large-scale First Amendment-protected expressive activity, even if the participants are striving to comply with the law. Significantly harsher treatment for people involved in certain kinds of expressive conduct, therefore, logically could "reasonably deter others from" engaging in that conduct.

*Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007).

Furthermore, courts have long recognized that even forms of expression associated with unlawful conduct are not necessarily without any First Amendment protections. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383-84 (1992) (invalidating a statute prohibiting cross-burning and noting that even constitutionally proscribable speech is not "entirely invisible to the Constitution"). So even if it were the case that that the Policies targeted only people who had violated the law,[14] that fact alone does not necessarily strip the conduct of the First Amendment protections it would otherwise enjoy.

---

[14] The *MacNamara* Plaintiffs argue that "the policy is plainly unconstitutional as to those plaintiffs whose charges were dismissed." (MacNamara Policies Opp'n Br. 7-8.) This argument misses the mark for a variety of reasons. First, criminal charges may be dismissed on a number of grounds. Consequently, dismissal is not conclusive evidence of innocence and certainly is not evidence of lack of probable cause. *See, e.g.*, *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (holding that arrest was supported by probable cause even when the charge was dismissed in the interests of justice); *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 504-05 (1984) ("A dismissal 'in the interest of justice' is neither an acquittal of the charges nor any determination of the merits. Rather, it leaves the question of guilt or innocence unanswered."). Second, the concern that the Policies were applied to people who should not have been arrested in the first place is more properly addressed, as it has been *supra* Section IV.B.3, in a discussion of the Fourth Amendment false arrest claim. Any treatment to which such Plaintiffs were wrongly subjected, including detention and fingerprinting, is more properly considered in determining their damages for those claims.

Once the No-Summons Policy is cast in the proper light, it is also not tenable to maintain, as Defendants do, that the Policy was content-neutral and thus entitled to intermediate scrutiny. (Defs.' Policies Br. 13.) Even though the "RNC-related" demonstrations to which the No-Summons Policy applied covered a wide range of political viewpoints, ranging from criticisms of overseas wars to pro-life denunciations of the Republican Party's abortion platform, *see Marcavage*, 689 F.3d at 102, those viewpoints all focused on protesting the RNC. The No-Summons Policy would not have applied, for example, to individuals protesting the labor policies of a City store, even if the demonstrations took place at the same time and at the same location. (Tr. at 79:20-79:23.) Although the City may have enforced the Policy without regard to the *particular* political viewpoint that the protesters espoused, it cannot be said that the Policy was strictly content-neutral, because "the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *See Burson v. Freeman*, 504 U.S. 191, 197 (1992) (plurality) (concluding that law prohibiting any campaign-related speech near polling place was not content-neutral); *accord Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536-37 (1980) (holding that a regulation prohibiting public utilities from including inserts discussing "controversial issues of public policy," but not other non-political matters, with customers' monthly bills is a content-based restriction on speech).

Content-based restrictions on First Amendment-protected expression receive strict, rather than intermediate, scrutiny. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("Our precedents . . . apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006). Strict scrutiny is particularly appropriate where, as here, the restrictions burden political speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."). Under strict scrutiny, content-based restrictions are "presumptively invalid" unless the Government can show that the restriction is "narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Grp. Inc.*, 529 U.S. 803, 813 (2000).

With respect to the interest promoted by the No-Summons Policy, Defendants assert that information available to the NYPD prior to the Policy's adoption suggested that large numbers of people were planning to come to the City to participate in unlawful and potentially violent activity and that those individuals, many of whom were from out of state, would likely engage in repeated unlawful conduct if they were merely given summonses. (Defs.' Policies 56.1 ¶¶ 175-189, 215-217.)

It does not seem that Plaintiffs genuinely dispute – nor could they – that the City faced threats of terrorism and that the RNC created a particularly large threat of violence and disorder. (*Id.* ¶¶ 64-66, 98-100; Schiller Policies Opp'n 56.1 ¶¶ 64-66, 98-100.) Nor do Plaintiffs appear to dispute that preventing terrorist and anarchist attacks and massive disorder constitutes a compelling government interest. *See, e.g.*, *Marcavage*, 689 F.3d at 105 (applying intermediate scrutiny but noting that the challenges surrounding the RNC "bespeak a significant – indeed, compelling – government interest

in security"); *Tabbaa v. Chertoff*, 509 F.3d 89, 103 (2d Cir. 2007) ("It is undisputed that the government's interest in protecting the nation from terrorism constitutes a compelling state interest . . . .").

Instead, Plaintiffs argue that the Policies were not actually motivated by the *particular* concerns cited by Defendants, and that Deputy Commissioner Cohen was not involved in the creation of the No-Summons Policy, which was adopted in April 2004 "without any deliberation." (Schiller Policies Opp'n Br. 2.) Moreover, Plaintiffs dispute that the threats of violence, false identification, and repeated unlawful conduct were specifically connected with RNC protests. (*Id.* at 3.)

The record does not definitively establish when the decision to adopt the No-Summons Policy was made. A memo from May 4, 2004 regarding an April 27, 2004 meeting of the "Mass Arrest/Prisoner Processing Sub-Committee" at the NYPD – before Cohen presented many of his findings to Commissioner Kelly and others – states that "[T]he following items were discussed: . . . No summonses will be issued." (Schiller Policies Add'l Facts ¶ 23.) Additionally, a former NYPD official, Patrick Devlin, asserted that as early as March or April, Chief Esposito stated "[d]efinitive[ly]" that no summonses would be issued. (*Id.*)

Defendants, however, insist that Cohen "conveyed the intelligence information and threat assessment to Chief Esposito and Commissioner Kelly and the reason he did so was to facilitate their planning for the policing of the Convention," which seems to be undisputed. (Defs.' Policies Reply Br. 7; *see* Defs.' Policies 56.1 ¶¶ 64, 154) Moreover, it is undisputed that, thereafter, numerous meetings took place in which NYPD officials further discussed,

formulated, and refined the strategies and policies that would be applied for RNC-related arrests. (Defs.' Reply 56.1 ¶¶ 149-150.) Based on all of the evidence in the record regarding the ongoing policymaking meetings, the Court finds that it cannot be reasonably disputed that the intelligence presented throughout the summer of 2004 informed the NYPD's decisionmaking about policies to apply to the RNC. Thus, the Court finds that the No-Summons Policy was adopted to promote a compelling set of government interests.

In light of that conclusion, the next question is whether the No-Summons Policy was narrowly tailored to serve those interests. Narrow tailoring requires that the No-Summons Policy be the "least restrictive means to further the articulated interest," *Sable Commc'ns, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) – in this case, averting mass disorder on a scale that could shut down the City and RNC (Defs.' Policies 56.1 ¶ 177). The Second Circuit recently confronted a similar question in a similar factual context in *Tabbaa v. Chertoff*. That case involved a group of American citizens of Muslim faith who were detained and searched by U.S. officials at the Canadian border pursuant to intelligence indicating that the conference they had attended in Canada included persons with known terrorist ties. *Tabbaa*, 509 F.3d at 92. As part of the special operation established in response to that intelligence, Homeland Security officers subjected the five plaintiffs to a screening procedure normally reserved for suspected terrorists, which included frisking, fingerprinting, photographing, and car searches, and which resulted in detention of four to six hours. *Id.* at 94-95. The *Tabbaa* plaintiffs brought suit, claiming, *inter alia*, that the special operation violated their fundamental First Amendment right of free association. *Id.* at 95.

25

The Second Circuit agreed that the operation imposed burdens on the plaintiffs' rights that were "sufficiently 'significant' to implicate the protections of the First Amendment." *Id.* at 102. Nevertheless, applying a strict scrutiny standard, *see id.*, the court found that there were no viable less restrictive means of achieving the government's undisputedly compelling interest in defending against terrorism. *Id.* at 103. Several aspects of the special operation informed that finding. First, the intelligence indicating that "certain individuals who were associated with terrorist organizations . . . would be in attendance" at the conference gave the government "ample justification to implement the [operation], which was explicitly designed" to serve the government's anti-terrorism interest. *Id.* (internal quotation marks omitted; ellipses in original). Second, the operation was "carefully circumscribed" and applied only to conferences "about which the government had specific intelligence regarding the possible congregation of suspected terrorists." *Id.* Third, it was "limited to routine screening measures." *Id.* And finally, it applied only "to those individuals, regardless of their religion, whom [the government] could establish had attended the conferences in question." *Id.*

The No-Summons Policy passes constitutional muster for similar reasons. Like the special operation procedure in *Tabbaa*, the No-Summons Policy was the City's answer to a threat derived from intelligence sources – namely, that demonstrators aimed to "shut down the City of New York and the RNC" through "continuous unlawful behavior" (Defs.' Policies 56.1 ¶ 177 (internal quotation marks omitted); *see id.* ¶¶ 104-109, 111-115) and would be undeterred by the issuance of summonses (*id.* ¶¶ 182-183). The Policy was tailored to apply only to persons

committing unlawful conduct related to the RNC – that is, the very persons who posed the threat revealed by intelligence (*id.* ¶¶ 186-188) – and was in place only for the brief duration the threat existed (*id.* ¶ 172). Finally, like the measures in *Tabbaa*, the City had no "viable alternatives" given the masses of demonstrators present in New York for the Convention. In *Tabbaa*, the Second Circuit rejected plaintiffs' argument that surveillance of individual conference attendees suspected of terrorism would have been a less restrictive alternative, noting that because "approximately 13,000 people attended the [conference,] it is entirely unrealistic to expect the government to have been able to identify and keep track of all those who personally interacted with suspected terrorists who attended the conference." *Tabbaa*, 509 F.3d at 104. During the RNC, the City similarly faced a large, undifferentiated threat involving hundreds of thousands of demonstrators. (Defs.' Policies 56.1 ¶ 8.) Under those circumstances, it is simply unrealistic to expect the City to have implemented a more narrowly tailored, individualized alternative to the No-Summons Policy. The Policy was tailored to concerns that individuals involved in RNC-related, summons-eligible offenses were far less likely to be deterred from continuing their unlawful conduct than the ordinary person committing a summons-eligible offense. This is supported by the information obtained by the NYPD about RNC protesters (*see* Defs.' Policies 56.1 ¶¶ 175-186), as well as common sense. Put simply, individuals from outside of the City, who were coming to the City for the sole purpose of protesting, were far more likely to repeat their illegal conduct if not removed from the scene, particularly if they believed the NYPD was unlikely to pursue prosecution once the protesters returned home. In this regard, RNC-related protesters were readily distinguishable from

street vendors who place their carts in a location that blocks traffic, or even City-based labor protesters seeking to temporarily impede traffic to have their views heard. In short, then, the Court finds that the City was justified in applying the No-Summons Policy as a check to serial protestors who might otherwise engage in repeat acts of disobedience designed to grind the City to a halt at minimal cost or inconvenience to the protestors themselves.

Plaintiffs appear not to contend that there was a less restrictive alternative to the No-Summons Policy. To the contrary, their chief attack on the Policy's tailoring is that it was insufficiently broad. Plaintiffs argue that if City officials truly were motivated by concerns that "terrorists" would engage in summons-eligible offenses, they should have arrested anyone guilty of illegal activity remotely connected to the Convention. (Schiller Policies Opp'n Br. 19.) Instead, Plaintiffs argue, the City continued to issue summonses for a range of offenses in the vicinity of Madison Square Garden, where RNC delegates were staying, dining, and otherwise spending time. (Schiller Policies Add'l Facts ¶¶ 19-20; Schiller Policies Br. 5-6).

Plaintiffs' tailoring argument fails for two reasons. First, no intelligence suggested that the RNC delegates, or the vendors serving them, shared the demonstrators' goal of disrupting the Convention or shutting down the City. Therefore, it would have been overreaching, not to mention foolish, to apply the No-Summons Policy to them.

Second, and more importantly, Plaintiffs misstate the City's interest. Terrorism was one but not the exclusive or chief factor motivating the No-Summons Policy. It is undisputed that intelligence suggested to City officials that demonstrators posed a more general threat of "continuous unlawful

behavior" that could lead to mass disorder and shutting down the City and RNC. (Defs.' Policies 56.1 ¶ 177 (internal quotation marks omitted).) Perhaps it is a feature of the post-9/11 age that people forget the dire consequences that can flow even from unlawful demonstrations, but it takes watching only a few moments of the video of the East 16th Street protest to see that no ambulance or fire truck could have gotten through that crowd of dancers, marchers, and instrument-wielding musicians. Writ large, the chaos on East 16th Street could have paralyzed the City and denied its residents access to the emergency services on which lives depend. The protestors simply had no right to hold ambulances, cabs, and commuters hostage by staging an impromptu parade in the middle of Manhattan. As the Supreme Court has recognized,

> [t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. . . . One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement.

*Cox v. Louisiana*, 379 U.S. 536, 554-55 (1965). The No-Summons Policy was as much addressed to this general fear of mass chaos as to the specific concerns regarding terrorism. Intelligence reports indicated that protestors planned to stage demonstrations

like the one on East 16th Street over and over.  (Defs.' Policies 56.1 ¶¶ 186-187.)  The City was not required to engage in an ineffectual game of tag, in which protestors could stop traffic, get a ticket, and proceed to their next rendezvous for further disorder.  The No-Summons Policy was tailored to this well-founded fear of recidivism, which could have rendered normally minor infractions highly disruptive and potentially dangerous.

Accordingly, the Court finds that the No-Summons Policy was narrowly tailored to address the unique challenges associated with hosting a four-day national political convention.  Based on these conclusions, the Court grants Defendants' motions for summary judgment regarding Plaintiffs' First Amendment claims challenging the City's No-Summons Policy.

b.   Fingerprinting Policy

Unlike the No-Summons Policy, which the Court found imposed a significant burden on Plaintiffs' First Amendment rights, the Court finds that the Fingerprinting Policy did not impose a sufficiently substantial burden to implicate the First Amendment.  That is because once Plaintiffs were under arrest, the additional burden imposed by the Fingerprinting Policy was minimal.[15]  *See Cnty. of Riverside*, 500 U.S. at 58 (recognizing fingerprinting as one of the "administrative steps incident to arrest").  Furthermore, there is no dispute that once the police had arrested the protestors, the police were entitled to demand identification.  It is difficult to see how fingerprinting chills First Amendment rights more than collecting identification

documents, particularly since both measures serve the same purpose of identifying arrestees.  *See Kelly*, 55 F.2d at 70 (holding that fingerprinting "is no more humiliating than other means of identification that have been universally held to infringe neither constitutional nor common-law rights").

Because the Court finds that the Fingerprinting Policy did not substantially burden Plaintiffs' First Amendment rights, the Court also grants Defendants' motions for summary judgment regarding Plaintiffs' First Amendment claims challenging the City's Fingerprinting Policy.

5.   First Amendment Retaliation

Defendants also seek summary judgment on Plaintiffs' claim that the Policies constituted retaliation for protestors' exercise of their First Amendment rights.  As an initial matter, it should be noted that Plaintiffs have not made any arguments pursuant to this First Amendment retaliation claim in their briefs.  For this reason alone, the Court would be justified in deeming the claims abandoned and granting summary judgment in favor of Defendants.  *See Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir. 1996) (deeming claims not addressed in briefing waived); *First Capital Asset Mgmt., Inc. v. Brickellbush*, 218 F. Supp. 2d 369, 392-93 (S.D.N.Y. 2002) (same).  However, even if Plaintiffs' retaliation claims were not abandoned, the Court finds that dismissal of such claims is appropriate.

"To establish a *prima facie* case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin*, 344 F.3d

---

[15] Again, to the extent that some Plaintiffs appear to suggest that the Fingerprinting Policy was implemented in a manner that unreasonably prolonged their detention, such a claim is properly taken up at a later time.

282, 287 (2d Cir. 2003) (internal quotation marks omitted). An adverse action in this context is "conduct that would deter a similarly situated individual of ordinary firmness." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011) (internal quotation marks omitted). However, even if the plaintiff establishes a prima facie case, the defendant may prevail on summary judgment by establishing dual motivation, *i.e.*, "that even without the improper motivation the alleged retaliatory action would have occurred." *Scott*, 344 F.3d at 287-88.

As set forth above, Plaintiffs have not established that the No-Summons and Fingerprinting Policies constituted adverse actions. In any event, even if Plaintiffs *could* establish a prima facie case of retaliation, Defendants have established that the Policies were motivated at least in substantial part by concerns about disorder that were specific to the nature of the RNC-related demonstrations. Accordingly, the Court dismisses Plaintiffs' retaliation claims, to the extent they have not been abandoned.

### 6. Fourteenth Amendment

All but the *Schiller* and *Dinler* Plaintiffs further argue that the Policies constitute a violation of the Equal Protection Clause of the Fourteenth Amendment insofar as they targeted individuals for different treatment based on whether they engaged in protest activities.

This claim substantially tracks Plaintiffs' First Amendment claims, since the crux of both claims is that the City burdened Plaintiffs' rights to speech and association by singling out individuals engaged in expressive conduct for different treatment. Accordingly, for the reasons stated above, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment claims. *Cf. City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 n.4 (1986) (rejecting respondents' argument that the ordinance at issue violated the Equal Protection Clause where they failed to demonstrate that it violated the First Amendment).

\*   \*   \*

For the foregoing reasons, the Court grants Defendants' motions for summary judgment on Plaintiffs' constitutional claims relating to the No-Summons and Fingerprinting Policies.

### V. CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment with respect to the false arrest claims at Fulton Street are HEREBY DENIED, and Plaintiffs' motions for summary judgment with respect to the false arrest claims at Fulton Street are GRANTED. With respect to the false arrest claims at East 16th Street, Defendants and Plaintiffs' cross-motions for summary judgment are DENIED. Defendants' motions for summary judgment with respect to the constitutionality of the No-Summons and Fingerprinting Policies are GRANTED. Plaintiffs' motions for summary judgment with respect to their state law fingerprinting claims are GRANTED, and Defendants' motions are DENIED. Plaintiffs' motion to strike is DENIED.

The Clerk of the Court is respectfully directed to terminate the following motions: in No. 04 Civ. 7921, Doc. Nos. 256, 262, and 267; in No. 04 Civ. 7922, Doc. Nos. 565, 568, and 578; in No. 04 Civ. 9216, Doc. Nos. 442, 447, 450, 454, and 463; in No. 04 Civ. 10178, Doc. Nos. 127, 131, and 135; in No. 05 Civ. 1562, Doc. No. 169; in

No. 05 Civ. 1563, Doc. No. 214; in No. 05 Civ. 1564, Doc. No. 208; in No. 05 Civ. 1565, Doc. No. 181; in No. 05 Civ. 1566, Doc. No. 193; in No. 05 Civ. 1567, Doc. No. 184; in No. 05 Civ. 1568, Doc. No. 167; in No. 05 Civ. 1569, Doc. No. 96; in No. 05 Civ. 1570, Doc. No. 204; in No. 05 Civ. 1571, Doc. Nos. 195, 198, and 202; in No. 05 Civ. 1572, Doc. Nos. 184, 187, and 191; in No. 05 Civ. 1573, Doc. No. 98; in No. 05 Civ. 1574, Doc. No. 85; in No. 05 Civ. 2910, Doc. No. 87; in No. 05 Civ. 2927, Doc. No. 83; in No. 05 Civ. 3478, Doc. No. 78; in No. 05 Civ. 3616, Doc. No. 88; in No. 05 Civ. 3705, Doc. Nos. 110, 114, and 118; in No. 05 Civ. 4949, Doc. No. 131; in No. 05 Civ. 5080, Doc. Nos. 201, 204, and 206; in No. 05 Civ. 5150, Doc. No. 81; in No. 05 Civ. 5152, Doc. Nos. 107, 111, and 116; in No. 05 Civ. 5268, Doc. Nos. 101 and 105; in No. 05 Civ. 5528, Doc. No. 119; in No. 05 Civ. 6193, Doc. No. 79; in No. 05 Civ. 6780, Doc. No. 211; in No. 05 Civ. 6918, Doc. No. 74; in No. 05 Civ. 7025, Doc. No. 77; in No. 05 Civ. 7026, Doc. No. 124; in No. 05 Civ. 7536, Doc. No. 80; in No. 05 Civ. 7541, Doc. No. 109; in No. 05 Civ. 7546, Doc. Nos. 101 and 105; in No. 05 Civ. 7547, Doc. No. 87; in No. 05 Civ. 7548, Doc. No. 88; in No. 05 Civ. 7575, Doc. No. 81; in No. 05 Civ. 7577, Doc. Nos. 206, 209, 210, and 214; in No. 05 Civ. 7579, Doc. Nos. 168, 171, and 175; in No. 05 Civ. 7580, Doc. No. 150; in No. 05 Civ. 7623, Doc. No. 193; in No. 05 Civ. 7624, Doc. No. 180; in No. 05 Civ. 7625, Doc. No. 84; in No. 05 Civ. 7626, Doc. No. 97; in No. 05 Civ. 7668, Doc. No. 146; in No. 05 Civ. 7669, Doc. No. 146; in No. 05 Civ. 7669, Doc. No. 138; in No. 05 Civ. 7672, Doc. No. 146; in No. 05 Civ. 7673, Doc. No. 178; in No. 05 Civ. 7670, Doc. Nos. 178, 181, and 186; in No. 05 Civ. 7789, Doc. No. 51; in No. 05 Civ. 8453, Doc. Nos. 258, 262, and 267; in No. 05 Civ. 8501, Doc. Nos. 133 and 136; in No. 05 Civ. 9483, Doc. No. 134; in No. 05 Civ. 9484, Doc. Nos. 174, 176, and 178; in No. 05 Civ. 9738, Doc. No. 109; in No. 05 Civ. 9901, Doc. Nos. 114 and 117; in No. 05 Civ. 9940, Doc. No. 62; in No. 05 Civ. 9974, Doc. No. 86; in No. 05 Civ. 9985, Doc. No. 105; in No. 05 Civ. 9987, Doc. No. 50; in No. 05 Civ. 10010, Doc. No. 68; in No. 06 Civ. 433, Doc. No. 105; in No. 06 Civ. 1779, Doc. No. 56; in No. 07 Civ. 7583, Doc. No. 51; in No. 07 Civ. 7678, Doc. Nos. 76, 78, and 82; in No. 07 Civ. 7683, Doc. No. 94; in No. 07 Civ. 7741, Doc. No. 57; in No. 07 Civ. 7751, Doc. Nos. 66, 69, and 72; in No. 07 Civ. 7752, Doc. No. 74; and in No. 08 Civ. 9098, Doc. No. 43.

By October 31, 2012, the parties shall submit a joint letter regarding the proposed next steps in these actions. In doing so, the parties should take this opportunity to reflect on this litigation and the prospects for a fair resolution of the remaining claims. The events underlying these actions occurred more than eight years, and two Republican National Conventions, ago. In a different legal context, Justice Robert Jackson once warned of the tradeoff between the "inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511 (1950). This litigation threatens to achieve the worst of each alternative, to the detriment of all parties and the Court itself. With that in mind, the Court urges the parties and their counsel to confer and assess the proper course toward a speedy and just resolution of these actions.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2012
New York, New York

\*          \*          \*

Plaintiffs in *Schiller v. City of New York*, No. 04 Civ. 7922, and *Dinler v. City of New York*, No. 04 Civ. 7921, are represented by Arthur Nelson Eisenberg, Christopher T. Dunn, Donna Lieberman, Daniel Erik Mullkoff, Palyn P. Hung, and Taylor Scott Pendergrass of the New York Civil Liberties Union, 125 Broad Street, 17th Floor, New York, New York 10004.

Plaintiffs in *MacNamara v. City of New York*, No. 04 Civ. 9216, are represented by Jonathan C. Moore, Clare R. Norins, Rachel M. Kleinman, Robert L. Herbst, and Spencer B. Freedman of Beldock Levine & Hoffman LLP, 99 Park Ave., 16th Floor, New York, New York 10016, and David Milton and William H. Goodman of Moore & Goodman, LLP, 99 Park Ave., Suite 1600, New York, New York 10016.

Plaintiffs in *Rechtschaffer*, No. 05 Civ. 9930, are represented by Jonathan C. Moore, and Rachel M. Kleinman of Beldock Levine & Hoffman LLP, and William H. Goodman and David Milton of Moore & Goodman, LLP.

Plaintiffs in *Portera*, No. 05 Civ. 9985, are represented by Jonathan C. Moore and Rachel M. Kleinman of Beldock Levine & Hoffman LLP.

Plaintiffs in *Abdell v. City of New York*, No. 05 Civ. 8453, are represented by Alan H. Levine, 99 Hudson Street, 14th Floor, New York, New York 10013, Martin R. Stolar, 351 Broadway, New York, New York 10013, Michael L. Spiegel, 111 Broadway, Suite 1305, New York, New

York 10006, and Susan Douglas Taylor and Frederick E. Best of the Law Office of Susan Douglas Taylor, 575 Madison Avenue, 10th Floor, New York, New York 10022.

Plaintiffs in *Conley*, No. 05 Civ. 10024, and *Banno*, No. 06 Civ. 2270, are represented by Jeffrey E. Fogel, 215 Spruce Street, Charlottesville, Virginia 22902, and Gideon Orion Oliver, Oliver & Oliver (NYC), 200 E. 10th St. #917, New York, New York 10003.

Plaintiffs in *Meehan v. Detective Nicholas Stanich*, No. 05 Civ. 5268, *Pagoda v. P.O. Monique Dulanto-Caban*, No. 05 Civ. 7546, *Karlin*, No. 05 Civ. 7789, and *Posr*, No. 07 Civ. 7583 are represented by Alan D. Levine, 80-02 Kew Gardens Road, Suite 302, Kew Gardens, New York 11415.

Plaintiffs in *Lee*, No. 05 Civ. 5528, *Cohen*, No. 05 Civ. 6780, *Dudek*, No. 04 Civ. 10178, *Bell v. City of New York*, No. 05 Civ. 3705, and *Starin v. City of New York*, No. 05 Civ. 5152, are represented by James I. Meyerson, 64 Fulton Street, Suite 502, New York City, New York 10038.

Plaintiffs in *Phillips v. City of New York*, No. 05 Civ. 7624, *Sloan v. City of New York*, No. 05 Civ. 7668, *Galitzer v. City of New York*, No. 05 Civ. 7669, *Bastidas v. City of New York*, No. 05 Civ. 7670, *Xu v. City of New York*, No. 05 Civ. 7672, *Sikelianos v. City of New York*, No. 05 Civ. 7673, *Drescher v. City of New York*, No. 05 Civ. 7541, *Concepcion v. City of New York*, No. 05 Civ. 8501, *Manders v. City of New York*, No. 07 Civ. 7752, *Jusick v. City of New York*, No. 07 Civ. 7683, and *Rigby v. City of New York*, No. 07 Civ. 7751, are represented by Jeffrey Adam Rothman, 315 Broadway, Suite 200, New York, New York 10007. Plaintiffs in *Sloan* and *Bastidas* are also represented by John Ware Upton, 70

Lafayette St., 7th Fl., New York, New York 10013. Plaintiff in *Concepcion* is also represented by Karen Finkel Wohlforth, 299 Broadway, Suite 1700, New York, New York 10007. Plaintiff in *Manders* is also represented by Alan D. Levine and Martin R. Stolar.

Plaintiffs in *Eastwood v. City of New York*, No. 05 Civ. 9483, *Adams v. City of New York*, No. 05 Civ. 9484, *Kennedy v. City of New York*, No. 07 Civ. 7678, and *Araneda v. City of New York*, No. 05 Civ. 9738, are represented by Michael L. Spiegel. Plaintiff in *Adams* is also represented by Susan Douglas Taylor and Frederick E. Best of the Law Office of Susan Douglas Taylor.

Plaintiffs in *Bunim v. City of New York*, No. 05 Civ. 1562, *Kalra v. City of New York*, No. 05 Civ. 1563, *Ryan v. City of New York*, No. 05 Civ. 1564, *Garbini v. City of New York*, No. 05 Civ. 1565, *Greenwald v. City of New York*, No. 05 Civ. 1566, *Pickett v. City of New York*, No. 05 Civ. 1567, *Tremayne v. City of New York*, No. 05 Civ. 1568, *Biddle v. City of New York*, No. 05 Civ. 1570, *Moran v. City of New York*, No. 05 Civ. 1571, *Botbol v. City of New York*, No. 05 Civ. 1572, *Crotty v. City of New York*, No. 05 Civ. 7577, *Stark v. City of New York*, No. 05 Civ. 7579, and *Lalier v. City of New York*, No. 05 Civ. 7580, are represented by Rose M. Weber, 225 Broadway, Suite 1607, New York, New York 10007.

Plaintiff in *Winkleman*, No. 05 Civ. 2910, is represented by Stephan H Peskin, Tolmage Peskin Harris & Falick, 20 Vesey Street, New York, New York 10007.

Plaintiff in *Grosso*, No. 05 Civ. 5080, is represented by David Adam Berger, Cornelius Patrick McCarthy, and Robert F Finkelstein of Allegaert Berger & Vogel LLP, 111 Broadway, 20th Floor New York, New York 10006.

Plaintiff in *Martini*, No. 05 Civ. 9881, is represented by Scott A. Korenbaum, Esq., 111 Broadway, Suite 1305, New York, New York 10006.

Plaintiff in *Carranza*, No. 05 Civ. 10010, is proceeding *pro se*.

Plaintiff in *Smith*, No. 06 Civ. 1779, is represented by Jason Jerome Rozger, Beranbaum Menken Ben-Asher & Bierman LLP, 80 Pine Street- 32nd Floor, New York, New York 10005.

Plaintiff in *Tikkun*, No. 05 Civ. 9901, is represented by Andrea J. Ritchie, 428 Park Place, Brooklyn, New York 11238, Rose M. Weber, Rose M. Weber Law Office, and Joey L. Mogul, People's Law Office, 1180 North Milwaukee, Chicago, Illinois 60622.

Defendants are represented by Jay Alan Kranis, Fred Michael Weiler, Jeffrey Anthony Dougherty, Peter Gerard Farrell, Raju Sundaran, and Tonya Jenerette of the New York City Law Department, 100 Church Street, New York, New York 10007.